**Affirmed and Opinion filed November 6, 2016.**



**In The**

# Fourteenth Court of Appeals

## NO. 14-15-00452-CR

### RYAN ANTONIO MATTHEWS, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 239th District Court
Brazoria County, Texas
Trial Court Cause No. 73841**

## NO. 14-15-00577-CV

### IN THE MATTER OF R.A.M.

**On Appeal from the County Court at Law No. 2 & Probate Court
Brazoria County, Texas
Trial Court Cause No. JV19869**

## IN THE MATTER OF R.A.M.

**On Appeal from the 300th District Court**
**Brazoria County, Texas**
**Trial Court Cause No. 73575**

## O P I N I O N

Appellant Ryan Antonio Matthews was convicted of two counts of capital murder. In five issues, he challenges his conviction and the order of the juvenile court waiving jurisdiction and transferring his case to criminal district court.[1] First, he asserts that the transfer order lacks the requisite factual specificity, and therefore, when the evidence admitted at the transfer hearing is measured against those findings it is insufficient to support the trial court's stated reasons for transfer. In his second and third issues, he contends that the Texas punishment and parole scheme for juvenile capital offenders is both facially unconstitutional and unconstitutional as applied to him because it deprives a juvenile of any meaningful opportunity for release and the sentence is imposed without regard to mitigating factors. In issue four, appellant urges that the trial court erred by denying his motion to suppress his statements because no sixteen-year-old juvenile would have believed he was free to leave when he was separated from his parents and questioned by officers about the murders of his two unborn children and their mother. Fifth and finally, appellant complains that the evidence is legally insufficient to support the jury's finding of guilt. We affirm.

---

[1] We note that, on appellant's motion, we consolidated these three related appeals by our order dated August 11, 2015.

# I.    Background

Sixteen-year-old Amy[2] was pregnant with twin boys when she was strangled and stabbed to death at her home in Pearland, Texas. Appellant, about three weeks shy of his seventeenth birthday at the time of Amy's murder,[3] was the father of Amy's unborn children. Both attended the same Pearland high school and had met in class. They were not dating but were involved in a sexual relationship. When Amy discovered she was pregnant, appellant was very upset. He encouraged her to take actions to induce a miscarriage, such as punching herself in the stomach several times a day. He also encouraged Amy to have an abortion. Appellant was very concerned about the impact having a child would have on his life; he even told Amy that he had considered killing himself because of the pregnancy. When Amy confessed to her parents she was pregnant, they quickly took her to a doctor. An ultrasound revealed that Amy was pregnant with twins; Amy thought this was good news. Appellant, on the other hand, was extremely upset to discover that Amy was having twins. When Amy told appellant that abortion was no longer an option, appellant was angry.

On the day of Amy's murder, appellant, Amy, and a friend of theirs skipped an afternoon class, and the friend drove them to Amy's home so that appellant and Amy could have sex. The friend had done this on several occasions in the past. The friend dropped them off, and appellant and Amy entered through the back door of Amy's home, as was their normal practice. The two went upstairs and had sex, although appellant claimed in an interview with detectives he did not "finish" because he was concerned he could hurt the babies. Appellant also claimed in that interview that he and Amy talked about their future and both became emotional.

---

[2] We replace the minor complainant's true name with a pseudonym.

[3] Amy was killed on March 21, 2014; appellant turned seventeen on April 5, 2014.

3

He stated he left the house alone through the back door, while Amy was upstairs crying.

Appellant's friend picked him up in front of the house about an hour later. His friend noted that appellant appeared "normal," but did not come out of the front door of the home accompanied by Amy as had happened in the past. Appellant was also wearing different clothing than he had been wearing earlier in the day. About forty-five minutes after appellant left Amy's home, Amy's younger brother arrived. Amy's brother called her name and didn't hear a response. He went upstairs and saw several items broken and lying on the floor in his parents' room. Thinking the house had been burglarized, he ran to a neighbor's house and called his mother.

Amy's mother tried to contact Amy, but Amy didn't respond. Amy's mother drove home from work immediately and entered the house through the garage. She saw the master bedroom in disarray, left the house and returned to the garage, and called 911. She told the 911 operator that her home had been burglarized, and she couldn't find her daughter. Amy's mother also called her husband at work. Amy's father drove home from work and arrived while Amy's mother was still there. He went inside the house to look around; during his search, he found Amy's body in her bedroom lying in a pool of blood.

Amy's father ran back downstairs to his wife, took her outside, and told her that their daughter was dead. The two began to cry and remained outside the house until police arrived. When Pearland Police Department officers arrived on the scene, Amy's father told them that their daughter had been murdered. Pearland police officers entered the home and found Amy's body. Amy's father told responding officers that appellant had gotten her pregnant and that he believed

4

appellant had killed her. Officers determined that the home had been staged to appear as if it had been burglarized; Amy's parents found nothing missing.

Pearland Police Detectives Jennifer Page and Cecil Arnold interviewed appellant later that evening around 10:00 p.m., after obtaining his address from the high school. At the time of this interview, the detectives had not had a chance to thoroughly review any of the evidence obtained from the crime scene, nor had any security videos from Amy's and appellant's high school or the guard house at the entry to Amy's neighborhood been obtained. The initial interview occurred at the home of Mavani Thornhill, who was allowing appellant to use her address so that appellant could enroll in a particular Pearland high school. Appellant's parents maintained a home in another part of Pearland zoned for a different high school. When Thornhill discovered the detectives were looking for appellant, she contacted appellant's parents and asked them to come to her home with appellant.

Detectives Page and Arnold initially spoke with appellant alone in Thornhill's home, with the permission of appellant's parents and appellant. This interview lasted for about an hour until Detective Arnold determined that appellant was not being honest with the detectives. For example, appellant first said he last saw Amy the previous day before admitting that he had been with her earlier that day. He also said that he had some type of feature on his cell phone that automatically deleted texts before admitting that he deleted the texts himself when his phone's storage got full. Appellant accurately described the clothes Amy was wearing when her body was found. He also admitted having sex with Amy on the day of her murder, but claimed he stopped because he was afraid he would hurt the babies. Appellant told the detectives he left Amy alone, upstairs, crying, and that he left the home through the back door. He told the detectives that he was supportive of Amy and never angry with her about the pregnancy. Detective

5

Arnold told appellant that the detectives were hearing rumors from other students that appellant and Amy had gotten into an argument, but appellant denied that had happened. Appellant insisted that when he left, Amy was unharmed. When pressed, appellant had no idea who would have harmed Amy.

Detective Arnold stopped the interview and asked appellant's parents and Thornhill to come into the room to encourage appellant to be honest and forthcoming. Appellant's parents and Thornhill did exactly that, encouraging him to tell the detectives what had happened and warning him that the truth would come out through the evidence at the scene. Appellant continued to insist that he had not harmed Amy. During the second exchange, the detectives collected some of appellant's clothing, including appellant's athletic shorts, shirt, underwear, and athletic shoes, as well as a DNA swab for subsequent testing. Appellant told Detective Arnold that none of Amy's blood would be on any of the clothing he wore to Amy's house. During the interviews, he also agreed to turn over his cell phone to the detectives and provided them with the pass code to access it. He told the detectives that he texted Amy around 4:00 p.m., but that she didn't respond, so he texted her again about an hour later. Subsequent analysis showed, however, that appellant sent Amy three quick text messages at around 3:25 p.m., with no responses from her.

Appellant and his parents agreed to allow the detectives to accompany them to appellant's home, where appellant turned over additional items, including another shirt, socks, blue jeans (that had been washed and bleached), and the backpack appellant said he had taken to school on the day of the murder. However, some of the clothing and the back pack appellant provided were different from what Detective Page later saw appellant wearing in a school security video recorded on the day of the murder. A multicolored backpack, tan shoes, and a shirt

6

similar to what is seen on the video were later recovered during execution of a search warrant.

According to Amy's autopsy, she died from a combination of manual strangulation and stabbing. The unborn twins suffocated and died in the womb when Amy died. Fingernail clippings were taken from Amy during the autopsy; appellant's DNA was recovered from these clippings. The blue jeans, athletic shoes, tan shoes, and the multicolored backpack all tested positive for Amy's DNA. DNA testing also confirmed that appellant had sex with Amy on the day of her murder and that he was the father of the twin boys.

Appellant testified during his trial. He acknowledged that he encouraged Amy to have an abortion and that he looked for ways that a miscarriage might be induced. He admitted that it bothered him for Amy to discuss the pregnancy, that he had a short temper, and that he was upset when other students tried to speak with him about the pregnancy. He explained that Amy was bleeding while they were having sex, which may have caused her blood to be found on his belongings. He also acknowledged that he had lied to investigators during his interview because he did not want his parents to know that he had skipped school to have sex with Amy. He testified that when he left on the day Amy was murdered, she was collecting clothes to wash, not crying on the bed as he had told Detectives Arnold and Page. He further stated that he had lied to investigators about the clothes he was wearing on the day of the murder.

After hearing the evidence and argument of counsel, a jury convicted appellant of two counts of capital murder as charged in the indictment. He was sentenced to life in the Texas Department of Criminal Justice, Institutional Division. Appellant filed a motion for new trial, which was denied by the trial court after a hearing. This appeal timely followed.

7

## II.     Sufficiency of the Evidence to Support Conviction

In appellant's fifth issue, he challenges the sufficiency of the evidence to support his conviction. Because this issue would require rendition of a judgment of acquittal, we address it before the remainder of appellant's issues.

## A.     Standard of Review and Applicable Law

When determining whether evidence is legally sufficient to support the verdict, we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational fact finder could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). We may not substitute our judgment for that of the fact finder by re-evaluating the weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Rather, we defer to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id.* If any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm. *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000). "[T]he State may prove the defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence." *Gardener v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009).

Finally, to prove capital murder as alleged in the indictment, the State had to prove appellant intentionally and knowingly caused the death of Amy by cutting or stabbing her with a knife or knife-like object or by manually strangling her and intentionally and knowingly caused the death of one of her unborn children. *See* Tex. Penal Code §§ 19.03(a)(7)(A) (making it a capital offense to intentionally or

8

knowingly murder more than one person during the same criminal transaction); 1.07(26) (defining an individual to include an unborn child).

## B.    Application

Much of the evidence supporting appellant's conviction is described above; we focus on some of the details here.  Appellant was unhappy about Amy's pregnancy—he texted her numerous times suggesting that she "punch" herself in the stomach to cause a miscarriage, and once her pregnancy was confirmed, he texted her several times in an effort to convince her that having an abortion would be best for both of them.  Amy, on the other hand, was not in favor of abortion and, when she discovered she was having twins, was happy.  Appellant was, to say the least, not happy about the news that he would be the father of not one, but two, children.  Additionally, Amy's murder occurred between 2:00 and 4:00 in the afternoon.  During that time, appellant was alone with her for over an hour and was the last person known to see her alive; her younger brother arrived home roughly forty-five minutes after appellant had left.  *See Torres v. State*, 141 S.W. 3d 645, 660–62 (Tex. App.—El Paso 2004, pet. ref'd) (considering, in sufficiency review, among other things, that the appellant was the last person seen with the murder victim alive).  The evidence of appellant's animus towards Amy's pregnancy and the narrow timeline for Amy's murder to occur are incriminating circumstances that support the jury's finding of appellant's guilt.

"A defendant's conduct after the commission of a crime which indicates a 'consciousness of guilt' is admissible to prove that he committed the offense." *Ross v. State*, 154 S.W.3d 804, 812 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd).  Appellant claims that there was no evidence to show that he is the one who strangled and stabbed Amy, but his guilt is evidenced by his attempts to conceal incriminating evidence and his multiple contradictory statements to authorities.

9

*See, e.g.*, *Guevara v. State,* 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt."); *see also Alexander v. State*, 229 S.W.3d 731, 740 (Tex. App.—San Antonio 2007, pet. ref'd). In this case, appellant lied to investigators about when he had last seen Amy and when he had last texted her, first claiming his text messages to Amy had been automatically deleted by his phone. He washed and bleached the jeans he wore on the day of the murder, although Amy's blood was still found on the cuffs of these jeans. He tried to explain the presence of this blood by claiming it was the result of her bleeding during sex. Finally, appellant gave a different pair of shoes and backpack to the police than those he had actually worn on the day of the murder. Both of these items were later obtained through a search warrant and had Amy's DNA on them. Additionally appellant's DNA was recovered from Amy's fingernail clippings.

Viewing this evidence in the light most favorable to the jury's verdict, we conclude that a rational juror could have found that appellant intentionally or knowingly killed Amy and her unborn children by strangling or stabbing her. Thus, there is legally sufficient evidence to support his conviction.

We overrule appellant's fifth issue and turn to his remaining issues.

### III. Juvenile Court's Waiver of Jurisdiction

In his first issue, appellant challenges the juvenile justice court's waiver of jurisdiction. Specifically, he contends that (1) the transfer order did not state the factual underpinnings of the court's conclusions and grounds for transfer; (2) the juvenile court misapplied the "sophistication and maturity factor"; and (3) the evidence from the transfer hearing is legally and factually insufficient to support the court's decision to waive jurisdiction.

## A. Applicable Law and Standard of Review

Section 54.02(a) of the Juvenile Justice Code provides that the juvenile court may waive its exclusive original jurisdiction and transfer a child to the criminal district court for criminal proceedings if the following is determined:

> (1) the child is alleged to have violated a penal law of the grade of felony;
>
> (2) the child was . . . 14 years of age or older at the time [of the alleged] offense, if the offense is a capital felony, an aggravated controlled substance felony, or a felony of the first degree[;] . . . and
>
> (3) after a full investigation and a hearing, the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense alleged or the background of the child the welfare of the community requires criminal proceedings.

Tex. Fam. Code § 54.02(a). When determining the seriousness of the offense alleged or the background of the child as found in the third requirement, section 52.04(f) requires the juvenile court to consider the following non-exclusive factors:

> (1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
>
> (2) the sophistication and maturity of the child;
>
> (3) the record and previous history of the child; and
>
> (4) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

*Id.* § 54.02(f).

As the petitioner seeking waiver and transfer, the State has the burden "to produce evidence to inform the juvenile court's discretion as to whether waiving its otherwise-exclusive jurisdiction is appropriate in the particular case." *Moon v. State*, 451 S.W.3d 28, 40 (Tex. Crim. App. 2014). The State must "persuade the

11

juvenile court, by a preponderance of the evidence, that the welfare of the community requires transfer of jurisdiction for criminal proceedings, either because of the seriousness of the offense or the background of the child (or both)." *Id.* at 40–41. When exercising its discretion to transfer, the juvenile court must consider all four of the factors listed in section 54.02(f). *Id.* at 41. Although it makes its final determination from the evidence concerning the section 54.02(f) factors, the juvenile court "need not find that each and every one of those factors favors transfer before it may exercise its discretion to waive jurisdiction." *Id.*

The *Moon* court, however, emphasized that, as required by section 54.02(h), if the juvenile court waives jurisdiction, it must "state specifically" in its order its reasons for waiver:

> Section 54.02(h) obviously contemplates that both the juvenile court's reasons for waiving its jurisdiction and the findings of fact that undergird those reasons should appear in the transfer order. In this way the Legislature has required that, in order to justify the broad discretion invested in the juvenile court, that court should take pains to "show its work," as it were, by spreading its deliberative process on the record, thereby providing a sure-footed and definite basis from which an appellate court can determine that its decision was in fact appropriately guided by the statutory criteria, principled, and reasonable . . . .

*Id.* at 49. Thus, we "should *not* be made to rummage through the record for facts that the juvenile court *might* have found, given the evidence developed at the transfer hearing, but did not include in its written transfer order." *Id.* at 50.

The Court of Criminal Appeals also clarified the standard of review to be applied by an appellate court when a juvenile court waives its exclusive jurisdiction pursuant to section 54.02. The court held: "[I]n evaluating a juvenile court's decision to waive its jurisdiction, an appellate court should first review the juvenile court's specific findings of fact regarding the Section 54.02(f) factors

12

under 'traditional sufficiency of the evidence review.'" *Id.* at 47.  After conducting a "traditional sufficiency of the evidence review" of the juvenile court's specific findings, the appellate court "should then review the juvenile court's ultimate waiver decision under an abuse of discretion standard." *Id.* at 47.

Regarding the abuse-of-discretion analysis, the *Moon* court explained,

[I]n deciding whether the juvenile court erred to conclude that the seriousness of the offense alleged and/or the background of the juvenile called for criminal proceedings for the welfare of the community, the appellate court should simply ask, in light of its own analysis of the sufficiency of the evidence to support the Section 54.02(f) factors and any other relevant evidence, whether the juvenile court acted without reference to guiding rules or principles. In other words, was its transfer decision essentially arbitrary, given the evidence upon which it was based, or did it represent a reasonably principled application of the legislative criteria?

*Id.*  With this framework in mind, we turn first to the facts specified in the transfer order in this case.

## B.     Order Containing Case-specific Facts in Support of the Transfer

As noted above, appellant first urges that the transfer order did not state the factual underpinnings of the court's conclusions and grounds for transfer.  We disagree.  In its transfer order, the juvenile court noted that it was considering the factors mandated by section 54.02(f) of the Juvenile Justice Code and then made the following findings and determinations:

- Appellant was alleged to have committed capital murder under Texas Penal Code section 19.03;

- Appellant was seventeen years old at the time of the hearing;

- Appellant was sixteen years old at the time of the offense;

- Appellant's father resides in Brazoria County and his mother resides in Harris County;

- No adjudication hearing had been conducted;

- The parties were properly notified of the hearing;

- Prior to the transfer hearing, a "complete diagnostic study" of appellant had been completed by Dr. Michael Fuller;

- There was probable cause to believe that appellant committed the felony offense of capital murder against a person;

- Appellant was of sufficient sophistication and maturity to be treated as an adult because he could aid an attorney in his defense;[4]

---

[4] Appellant asserts that the juvenile court "misapplied the sophistication and maturity factor." The *Moon* court noted that "it is doubtful that the Legislature meant for the sophistication-and-maturity factor to embrace the juvenile's ability to waive his constitutional rights and assist in his defense." *Moon*, 451 S.W.3d at 50 n.87. The court explained,

> No case has ever undertaken to explain, however, exactly *how* the juvenile's capacity (or lack thereof) to waive his constitutional rights and assist in his defense is relevant to whether the welfare of the community requires transfer, and we fail to see that it is. Other courts of appeals have rightly declared "the purpose of an inquiry into the mental ability and maturity of the juvenile [to be] to determine whether he appreciates the nature and effect of his voluntary actions and whether they were right or wrong."

*Id.* (quoting *In re E.D.N.*, 635 S.W.2d 798, 801 (Tex. App.—Corpus Christi 1982, no pet.)). Based on this guidance from the Court of Criminal Appeals, it may be that the juvenile court misapplied this factor by focusing on whether appellant was sufficiently sophisticated and mature *to aid in his defense*. However, as discussed *infra*, the juvenile court's other factual bases for transfer are supported by legally and factually sufficient evidence. And, as also explained *infra*, these facts provide "a sure-footed and definite basis" from which we may conclude that the juvenile court's transfer decision was "appropriately guided by the statutory criteria, principled, and reasonable." *See id.* at 49; *see also Gonzales v. State*, 467 S.W.3d 595, 602 (Tex. App.—San Antonio 2015, pet. ref'd).

14

- Appellant's records and previous history made the prospects of adequate protection for the public and the likelihood of reasonable rehabilitation by the use of the Juvenile Justice Court doubtful;

- Because of the extreme and severe nature of the offenses alleged, the prospects of adequate protection for the public and the likelihood of reasonable rehabilitation through the Juvenile Justice system were doubtful; and

- After considering all of the testimony, diagnostic study, social evaluation, and full investigation of appellant and the circumstances of the offenses alleged, and because of the seriousness of the alleged offenses and background of appellant, the welfare of the community required criminal proceedings.[5]

---

[5] These findings are similar to those made in other juvenile-transfer cases in which our sister courts have determined that the transfer order was sufficiently specific. *See, e.g.*, *Rodriguez v. State*, 478 S.W.3d 783, 788–89 (Tex. App.—San Antonio 2015, pet. ref'd) ("Here, after careful consideration of all the evidence presented, the juvenile court made the following findings: 1. Rodriguez was alleged to have committed murder under Section 19.02 of the Texas Penal Code. 2. Rodriguez was sixteen years old at the time of the transfer hearing. 3. Rodriguez was fourteen years or older but under seventeen years old at the time he is alleged to have committed the offense. 4. Rodriguez's mother resides in Bexar County. 5. No adjudication hearing has been conducted to this point. 6. The notice requirements of Sections 53.04, 53.05, 53.06, and 53.07 were satisfied. 7. Prior to the hearing, the Court ordered a psychological examination, complete diagnostic study, social evaluation, and full investigation of the child, his circumstances, and the circumstances of the alleged offense; although Rodriguez refused to cooperate in the psychological examination, all other studies were completed. 8. The Court considered whether the offense was against person or property and found the offense was against a person. 9. The Court considered Respondent's sophistication and maturity and found him sophisticated and mature enough to be transferred into the criminal justice system; he understands the allegations, court proceedings, and possible consequences. 10. After considering the record and previous history of the child, the prospects of adequate protection of the public, and the likelihood of rehabilitation of the child by use of the procedures, services, and facilities currently available to the Juvenile Court, the Court found the Juvenile Court inadequate for the rehabilitation of the child while also protecting the public. 11. Following a full investigation and hearing, the Court found probable cause to believe the child committed the offense and that the seriousness of the offense, background of the child, and welfare of the community requires that

15

In contrast to these case-specific findings, in *Moon*, the only reason specifically stated in the juvenile court's order to justify the waiver of jurisdiction was that the offense alleged was a serious one, and the only fact specified in support of this reason was that the offense alleged was committed against the person of another. *Id.* at 50; *see also Guerrero v. State*, 471 S.W.3d 1, 4 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Further, the Court of Criminal Appeals determined that other fact findings included in the juvenile court's written order were "superfluous" because they would have been relevant to support a transfer for the alternative reason that the appellant's background sufficed to render waiver of juvenile jurisdiction appropriate, but the court did not cite the appellant's background as a reason in the transfer order. *See Moon*, 451 S.W.3d at 50–52.

In this case, the transfer order specifically references, *inter alia*, appellant's record and previous history and the "extreme and severe nature" of the two counts of capital murder in support; it does not state barely that appellant committed a serious offense against a person as in *Moon*. *See id.* at 50; *cf. Gonzales v. State*, 467 S.W.3d 595, 601–02 (Tex. App.—San Antonio 2015, pet. ref'd) (noting that

---

the criminal proceedings move to Criminal District Court."); *Gonzales v. State*, 457 S.W.3d 595, 602 (Tex. App.—San Antonio 2015, pet. ref'd) ("Here, the juvenile court made the following findings: 1) Gonzales was alleged to have committed murder under Texas Penal Code section 19.02; 2) Gonzales was sixteen at the time of the hearing; 3) Gonzales was fifteen at the time of the offense; 4) Gonzales's mother resides in Bexar County; 5) no adjudication hearing had yet been conducted; 6) the parties were properly notified of the hearing; 7) prior to the hearing, the trial court obtained a psychological assessment including a psychological examination, a complete diagnostic study, a social evaluation, full investigation of Gonzales, Gonzales's circumstances, and the circumstances of the alleged offense; 8) the offense was against a person; 9) Gonzales is sophisticated and mature enough to be transferred into the criminal justice system and he understands the allegations, the court proceedings, and their possible consequences; 10) the procedures, services, and facilities available to the Juvenile Court are inadequate for rehabilitation of Gonzales while also protecting the public; and 11) after a full investigation and hearing, Gonzales's circumstances, and the circumstances of the offense, there is probable cause to believe that Gonzales committed the offense and, because of the seriousness of the offense and the background of Gonzales, the welfare of the community required that criminal proceedings proceed in Criminal District Court.").

the juvenile court's findings were specific as to the appellant and provided a sufficient basis for waiver of juvenile jurisdiction). As in *Gonzales*, the juvenile court made findings *as to appellant* that "provided a 'sure-footed and definite basis from which an appellate court can determine that its decision was in fact appropriately guided by the statutory criteria, principled, and reasonable.'" *See Gonzales*, 467 S.W.3d at 602 (quoting *Moon*, 451 S.W.3d at 49).

Thus, this case is distinguishable from *Moon*, as well as *Guerrero*, and is in line with our sister courts of appeals's application of *Moon*. *See, e.g.*, *In re S.G.R.*, –S.W.3d–, No. 01-16-00015-CV, 2016 WL 3223675, at *3–6 (Tex. App.— Houston [1st Dist.] Jun. 9, 2016, no pet. h.); *Rodriguez v. State*, 478 S.W.3d 783, 788–89 (Tex. App.—San Antonio 2015, pet. ref'd); *Gonzales*, 467 S.W.3d at 601– 02. As such, we turn to whether the evidence in this case supports the trial court's factual findings.

**B. Legally and Factually Sufficient Evidence Supports the Factual Recitations in the Transfer Order**

Appellant also contends that the evidence admitted at the transfer hearing is legally and factually insufficient to support the juvenile court's decision to waive jurisdiction. We focus primarily on evidence supporting the trial court's findings concerning (1) appellant's records and history; (2) the "extreme and severe nature" of the offenses alleged; and (3) the likelihood of reasonable rehabilitation by the Juvenile Justice System for appellant.

In conducting a legal-sufficiency review, we credit evidence favorable to the challenged finding and disregard contrary evidence unless a reasonable fact finder could not reject the evidence. *Moon v. State*, 410 S.W.3d 366, 371 (Tex. App.— Houston [1st Dist.] 2013), *aff'd*, 451 S.W.3d at 52. If there is more than a scintilla of evidence to support the finding, the no-evidence challenge fails. *Id.* Under a

17

factual-sufficiency review, we consider all of the evidence presented to determine if the court's finding is so against the great weight and preponderance of the evidence as to be clearly wrong or unjust. *Id.* With these particular standards in mind, we consider the evidence from the transfer hearing relative to the above-listed findings.

First, concerning appellant's records and history, Dr. Michael Fuller examined appellant for the certification hearing. Fuller testified that appellant had no significant major psychiatric illness and that appellant could think clearly and understand age-appropriate concepts. Fuller concluded that appellant was intellectually and emotionally average for his age at the time of the testing—seventeen—and that appellant understood the charges against him and what it meant to be certified as an adult. Fuller testified that it would be "appropriate and reasonable" for the juvenile court to certify appellant as an adult.

The juvenile court was also presented evidence of appellant's prior juvenile record: one adjudication for assault in 2008 and another for credit card abuse in 2011. Further, appellant's juvenile justice predisposition report was entered into evidence at the hearing. This report notes that appellant "has had two referrals to the Brazoria County Juvenile Justice Department [for offenses] that were violent in nature." Appellant's school disciplinary history showed one incident for a "classroom scuffle" and prior incidents such as conduct code violations, failure to attend detention hall or class, insubordination, dress code violations, stealing, and excessive tardiness. Further, Detective Arnold testified about the many inconsistencies in appellant's statements during interviews. Arnold stated appellant was able to lie without hesitation regarding appellant's whereabouts on the afternoon of the murder, as well as what he had been wearing. Arnold testified that appellant had threatened other students at his high school who had been

18

talking about Amy's pregnancy. Finally, Arnold testified that he believed appellant to be a flight risk, based on his opinion that appellant's "criminal history show[ed] escalating behavior from physical assault, thefts, credit card abuse, all the way to where we are now, [and] the fact that [appellant] was using a fake address so that he could attend a different school." These facts support the juvenile court's waiver of jurisdiction.

Second, concerning the "extreme and severe" nature of the offenses, the trial court's findings regarding this capital murder and the evidence supporting these findings do not suggest, as appellant implies, a mere category-of-the-offense transfer. *See Moon*, 451 S.W.3d at 48 (distinguishing between generic findings relating to the "category of the crime alleged" and "the specifics of the particular offense"). Instead, the evidence shows the particularly egregious character of this capital murder. Appellant murdered his sixteen-year-old paramour and unborn twins by strangling her and then stabbing her, shortly after having had sex with her. The unborn twins died by asphyxia when their mother died. Although capital murder is certainly a serious offense, the facts here—which are described in the "counts" included in the transfer order and may be gleaned from the offense report, the autopsy report, and the predisposition report that were all admitted as exhibits at the hearing—are undoubtedly "extreme and severe." Thus, both the court's finding regarding the extreme and severe nature of the offense and the finding that the offense alleged is capital murder against a person, not property, are amply supported in this record. *Cf. id.* (order was insufficient because the only reason stated was that "the offense alleged is a serious one").

Further, former caseworker for the Texas Youth Commission, now known as the Texas Department for Juvenile Justice (TDJJ), Martha Mosshart took the stand at the hearing. She testified that the TDJJ has had extremely few capital offenders.

In fact, from 2007 to 2012, only twelve capital offenders have been committed to the TDJJ out of a total of 7,496 commitments. All of those capital offenders were given determinant sentences; none were simply committed to TDJJ. She stated that these juveniles generally are transferred to the Texas Department of Criminal Justice (TDCJ) once they reach a certain age—usually proceedings to transfer them begin within a month of their nineteenth birthdays.[6]

Mosshart explained that the TDJJ has a program for violent offenders, but that there is generally a wait list to get into the program. She agreed that because of the nature of the alleged conduct, appellant would likely get priority status for the program, however. Mosshart suggested that a commitment to TDJJ alone would not be appropriate for the type of offense that appellant was alleged to have committed—i.e., that appellant should be given a determinate sentence even should the juvenile court not waive jurisdiction. She noted there was only a short window of time to get appellant into this treatment program, given his age and likely impending transfer to TDCJ when he turned nineteen. This evidence supports the juvenile court's conclusion concerning the likelihood of appellant's reasonable rehabilitation through the Juvenile Justice System.

In sum, based on this evidence, we cannot say the juvenile court abused its discretion in waiving its jurisdiction and transferring appellant for criminal proceedings. The State adequately established, "by a preponderance of the evidence, that the welfare of the community requires transfer of jurisdiction for criminal proceedings, either because of the seriousness of the offense or the background of the child (or both)." *Moon*, 451 S.W.3d at 40–41. The juvenile

---

[6] We note that, at the time of appellant's transfer hearing in July 2015, he was 18 years old and would be turning 19 nine months later in April 2016.

20

court's decision was appropriately guided by the statutory criteria, principled, and reasonable. *See Gonzales*, 467 S.W.3d at 602.

We overrule appellant's first issue.

## IV.    Constitutionality of Texas's Juvenile Capital Offender's Punishment and Parole Scheme

In appellant's second and third issues, he challenges the constitutionality of Texas's "punishment scheme" for juvenile capital offenders who are tried as adults.  In issue two, he asserts that Texas's punishment and parole scheme are facially unconstitutional.  In his third issue, he asserts this same scheme is unconstitutional as applied to him.  We address both issues together.

We review the constitutionality of a criminal statute de novo.  *Ex parte Lo*, 424 S.W.3d 10, 14 (Tex. Crim. App. 2013).  We generally begin with the presumption that the statute is valid and the legislature did not act arbitrarily or unreasonably in enacting it.  *Ex parte Flores*, 483 S.W.3d 632, 639 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (citing *Rodriguez v. State*, 93 S.W.3d 60, 69 (Tex. Crim. App. 2002)).  The party attacking the statute's constitutionality generally bears the burden of establishing the statute is unconstitutional.[7]  *See Flores*, 483 S.W.3d at 639.

Appellant asserts that section 12.31 of the Texas Penal Code, governing punishment for capital felonies, is unconstitutional both facially and as applied to him.  This statute provides:

> (a) An individual adjudged guilty of a capital felony in a case in which the state seeks the death penalty shall be punished by

---

[7] To be successful in a facial challenge to a statute, the party must establish that no set of circumstances exists under which that statute would be constitutionally valid.  *State v. Rosseau*, 396 S.W.3d 550, 557 (Tex. Crim. App. 2013). Regarding an as-applied challenge to a statute, the party must establish that a statute is unconstitutional as applied to his particular set of facts and circumstances.  *See London v. State*, 490 S.W.3d 503, 507–08 (Tex. Crim. App. 2016).

imprisonment in the Texas Department of Criminal Justice for life without parole or by death. An individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for:

> (1) life, if the individual committed the offense when younger than 18 years of age; or

> (2) life without parole, if the individual committed the offense when 18 years of age or older.

Tex. Penal Code § 12.31.

Both the Texas Court of Criminal Appeals and this court have rejected claims that this statute is facially unconstitutional. *See Lewis v. State*, 428 S.W.3d 860, 863–64 (Tex. Crim. App. 2014); *Lewis v. State*, 448 S.W.3d 138, 146 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). Further, "[j]uvenile offenders sentenced to life with the possibility of parole are not entitled to individualized sentencing under the Eighth Amendment." *Turner v. State*, 443 S.W.3d 128, 129 (Tex. Crim. App. 2014) (reversing an as-applied constitutional challenge to Penal Code section 12.31(a)(1)). "When the Court of Criminal Appeals has deliberately and unequivocally interpreted the law in a criminal matter, we must adhere to its interpretation under the dictates of vertical stare decisis." *Mason v. State*, 416 S.W.3d 720, 728 n.10 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

As the court of last resort in criminal matters in this State has unequivocally spoken on both of appellant's constitutional issues and rejected them, we overrule appellant's second and third issues.

## V.    Trial Court's Denial of Motion to Suppress

In issue four, appellant urges that the trial court erred by denying his motion to suppress. Specifically, he complains that "[u]nder the objective circumstances, a sixteen year old would have believed that he was not free to leave when he was

separated from his parents and questioned about the murder of the mother of his children." Thus, appellant is asserting that he was in custody at the time of his recorded interviews with police. It is undisputed that appellant was not provided with statutory warnings under either the Juvenile Justice Code or the Texas Code of Criminal Procedure before talking with police officers during these interviews. *See* Tex. Fam. Code § 51.095; Tex. Code Crim. Proc. art. 38.22, § 3.

## A.   Standard of Review and Governing Law

A trial court's ruling on a motion to suppress is reviewed for an abuse of discretion. *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014). We give almost total deference to the trial court's determination of historical facts and to the trial court's application of law to fact questions that turn upon credibility and demeanor. *Alford v. State*, 358 S.W.3d 647, 652 (Tex. Crim. App. 2012). This deferential standard similarly applies when the trial court's determinations are based on a recording admitted into evidence at a suppression hearing. *See Montanez v. State*, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006) (video recording). However, mixed questions of law and fact that are not based on evaluations of credibility or demeanor, such as the question of whether an interrogation is custodial, are reviewed de novo. *Jeffrey v. State*, 38 S.W.3d 847, 853 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd).

If an individual is subjected to questioning while in custody without first being warned of his rights and without voluntarily waiving those rights, then any evidence obtained as part of that questioning may not be used against him at trial. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966). Section 51.095 of the Juvenile Justice Code incorporates the warnings required by *Miranda*, with additional safeguards in place to protect juveniles. *See* Tex. Fam. Code § 51.095. But, section 51.095 does not preclude admission of a juvenile's statement if the

statement does not stem from custodial interrogation. *See id.* § 51.095(b), (d); *see also Laird v. State*, 933 S.W.2d 707, 713 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd) (discussing prior version of statute and explaining that it "allows an oral statement to be admitted if it is not in response to custodial interrogation").

In turn, "[c]ustodial interrogation is questioning that is initiated by law enforcement after a person has been taken into custody or otherwise deprived of his freedom in any significant way." *Delacerda v. State*, 425 S.W.3d 367, 386 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). To determine whether an individual is in custody, we focus on the objective circumstances of the questioning, not on the subjective views of either the interrogating officers or the person being questioned. *See Stansbury v. California*, 511 U.S. 318, 322 (1994); *In re D.J.C.*, 312 S.W.3d 704, 712 (Tex. App.—Houston [1st Dist.] 2009, no pet.). We also consider whether, based upon the objective circumstances, a reasonable child of the same age would believe his freedom of movement was significantly restricted. *Jeffley*, 38 S.W.3d at 855. "Factors relevant to a determination of custody include (1) probable cause to arrest; (2) focus of the investigation; (3) subjective intent of the police; and (4) subjective belief of the defendant." *Id.* (citing *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996)).

Finally, the Court of Criminal Appeals has also established four general situations which may constitute custody: (1) if the suspect is physically deprived of his freedom in any significant way; (2) if a law-enforcement officer tells the suspect not to leave; (3) if a law-enforcement officer creates a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (4) there is probable cause to arrest the suspect and the law-enforcement officer did not tell the suspect he is free to leave. *Gardner v. State*, 306 S.W.3d 274, 293–94 (Tex. Crim. App. 2009); *Dowthitt*, 931 S.W.2d at

255.  In all four cases, there must be a restriction of freedom of movement that is tantamount to an arrest.  *See Dowthitt*, 931 S.W.2d at 255.  And we consider the totality of circumstances surrounding an interrogation to determine whether the suspect was in custody during the interrogation.  *See id.*  With these principles in mind, we turn to the circumstances surrounding the questioning of appellant.

## B.    Application

From both the hearing on the motion to suppress, where Detectives Page and Arnold testified, and the audio recording of the interviews, we glean the following. Detectives Page and Arnold went to Mavani Thornhill's home, believing it was where appellant lived;[8] when they first arrived, no one was home, so they drove a few blocks away and attempted to determine where appellant was.  They returned to Thornhill's home and spoke with her daughter; she contacted Thornhill who then contacted appellant's parents and requested that they bring appellant to her home.  Thornhill arrived at her home while the detectives were there, as did appellant and his parents.

The detectives were armed, but their weapons were hidden under their jackets, and neither was in uniform.  The detectives went inside the home with appellant and spoke with appellant in an unlocked room; appellant's parents did not seek to join him in the interview.  Appellant was not searched, handcuffed, nor read his rights.  Appellant was seated closest to the door of the room; neither of the detectives blocked his access to the door or sat close to him.  Thornhill entered the

---

[8] The detectives went to Thornhill's home directly from the scene of the offense and had not had a chance to review the evidence collected at the crime scene, view the security video from the guard house at the entrance to Amy's neighborhood that confirmed appellant's friend had driven him there on the day of the offense, or view the security video from appellant's school showing what clothes appellant had been wearing when he left school with Amy that day. In fact, as discussed below, Arnold and Page were not aware that appellant had been to Amy's house that day until appellant admitted during the interview that he had been, although Amy's father had stated to officers at the scene that he believed appellant had killed Amy.

room shortly after the interview began and was not told to leave, although she simply asked a question and then left. About twenty-five minutes into the interview, Arnold told appellant he was free to leave, stating: "I mean, you – you came here. I mean, you don't have to talk to me. I mean, you can get up and walk out of here; but I – and I appreciate you sitting here talking with me trying to get to the bottom of this stuff." Appellant never tried to leave the interview.

During the course of the interview with the detectives, appellant told the detectives that he lived at Thornhill's home a few days a week and lived at his father's house the rest of the time. Although appellant initially denied having been to Amy's home that day, he later acknowledged that he had gone there to have sex with her. He stated that he had been hesitant to have sex with her because he was worried it would "smush" the babies, so he stopped before he ejaculated. Appellant denied harming Amy and said she was fine when he left, although he left her in her bedroom crying because they had both been upset about the upcoming changes in their lives due to the unplanned pregnancy.

About an hour into the interview, Arnold told appellant that he believed appellant had been attempting to deceive him. Arnold took a break and asked appellant's parents and Thornhill to join the detectives and appellant in the den for the remainder of the interview. Appellant's parents and Thornhill encouraged appellant to tell the truth. Appellant continued to deny that he had harmed Amy. On the request of the detectives, appellant provided a DNA sample and the clothing he was wearing. The detectives followed appellant and his parents back to appellant's home to retrieve other clothing appellant said he had been wearing that day, as well as the backpack he told the detectives he'd been carrying. Appellant and his parents accompanied the detectives to appellant's room where appellant attempted to find the clothes he said he had been wearing; they found his

26

jeans, which had been washed, and his backpack. They found more of the clothes downstairs in the basement in the dirty clothes bin. The detectives took these items and left.[9]

At the hearing on the motion to suppress, Arnold and Page testified. Page testified that no threats were made against appellant during the interview and that appellant's freedom of movement was not restrained. Arnold stated that, although he did not believe appellant had been truthful during his interview, he also did not believe he had probable cause to arrest him at any time during the interview.[10] As noted above, when the detectives began interviewing appellant, they had been informed that appellant was the father of Amy's children, that appellant had been in a relationship with her, and that Amy's father believed appellant was responsible for her death. In fact, until appellant acknowledged during the interview that he had been to Amy's house earlier that day, Page and Arnold were unaware that he had been with Amy shortly before her death. And although the detectives discovered that appellant had been with Amy earlier that day before Arnold told appellant he was free to leave at any point, none of the evidence linking appellant to Amy had been obtained or processed. In fact, appellant never admitted harming Amy and, according to Arnold, could have been lying about what happened because he was scared and had done something he knew his parents would be unhappy about—i.e., skipping class and going to Amy's house to have sex with

---

[9] As discussed above, a security video from the school taken the afternoon of the murder and later viewed by Page showed that some of the clothes appellant provided at his home were not those he had actually been wearing, nor had he been carrying the backpack he provided to Arnold and Page. The actual items shown in the security video were later obtained through a search warrant.

[10] "Probable cause exists where the police have reasonably trustworthy information sufficient to warrant a reasonable person to believe a particular person has committed or is committing an offense." *Chapnick v. State*, 25 S.W.3d 875, 878 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd).

her. Thus, Arnold's statement that he did not believe he had probable cause to arrest appellant is supported by the record and timeline of events.[11]

The trial court found that appellant was not in custody at any time during the questioning. We agree. When the circumstances show, as here, that a person is acting upon the invitation, urging, or request of police officers without any threat or coercion by the officers, that person is acting voluntarily and is not in custody. *See, e.g.*, *Nickerson v. State*, 312 S.W.3d 250, 256 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd); *Turner v. State*, 252 S.W.3d 571, 580 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd); *see also Delacerda*, 425 S.W.3d at 386–88 (noting that the appellant voluntarily went with officers into police station to homicide division office for questioning and merely being questioned at stationhouse, by itself, does not constitute custody); *cf. In re D.F.C.*, 312 S.W.3d at 714 (holding that "there was a restraint of movement to the degree associated with formal arrest" when juvenile went to stationhouse for interview but magistrate read defendant his *Miranda* warnings, defendant's grandmother was excluded from interview despite her request, and defendant was alone in locked interrogation

---

[11] Even had Arnold believed that he had probable cause to arrest appellant before or sometime during the interview, the circumstances of this case still do not establish that appellant was "in custody." *See Dowthitt*, 931 S.W.2d at 255 ("The determination of custody must be made on an ad hoc basis, after considering all of the (objective) circumstances."). First, we note that there is simply nothing in our record to indicate that either Arnold or Page "manifested" to appellant that there was probable cause to arrest him or that appellant himself believed that the detectives had probable cause to arrest him. *See id.* "[G]iven our emphasis on probable cause as a 'factor' in other cases, . . . custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *Id.* That is because it is the "compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning [is] conducted" that determines whether a suspect is in custody. *See Stansbury v. California*, 511 U.S. 318, 323 (1994). Thus, even if the detectives had honed in on appellant as the primary suspect in their investigation, there is no indication that either Arnold or Page restrained appellant to the degree associated with an arrest or deprived him of his physical freedom in any way before, during, or after the questioning, as discussed further *infra*. *See Estrada v. State*, 313 S.W.3d 274, 294–95 (Tex. Crim. App. 2010).

room with armed officer). Our record reflects that appellant voluntarily spoke to the officers; he was acting on their invitation and there was no showing of coercion or threat by either Page or Arnold. Appellant was not in a locked room with armed police officers; his parents were not excluded from the room; he was explicitly told he could leave by Detective Arnold; and Detective Arnold did not have probable cause to arrest appellant at any time during the interview. *Cf. In re D.F.C.*, 312 S.W.3d at 714.

In short, appellant's freedom of movement was not restrained to the degree associated with a formal arrest. *See Delacerda*, 425 S.W.3d at 386–88; *Nickerson*, 312 S.W.3d at 256; *Turner*, 252 S.W.3d at 580. Thus, he was not in custody. Under these circumstances, the trial court did not err in denying appellant's motion to suppress. We overrule appellant's fourth issue.

## VI. Conclusion

Having overruled each of appellant's issues, we affirm the trial court's judgment.

/s/ Sharon McCally
Justice

Panel consists of Chief Justice Frost and Justices McCally and Brown.
Publish — Tex. R. App. P. 47.2(b).

29