**Opinion issued May 21, 2019**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-00017-CV

_____

## IN THE MATTER OF A.M.

---

**On Appeal from the County Court at Law No. 1**
**Fort Bend County, Texas**
**Trial Court Case No. 12-CJV-017003**

---

## DISSENTING OPINION ON REHEARING

I respectfully dissent. The majority opinion is deeply contrary to established law. It creates a wholly new, unprecedented, and unworkable standard of review of a juvenile court's findings with respect to a transfer from juvenile court to

criminal district court of proceedings filed against a juvenile before his eighteenth birthday but decided after his eighteenth birthday, and it erroneously dismisses the case for lack of jurisdiction.

**Background**

This case is before this Court following remand from the Fourteenth Court of Appeals to the juvenile court in which murder proceedings were initiated against A.M. before his eighteenth birthday. The case was initially transferred by the juvenile court to criminal district court after A.M.'s eighteenth birthday. A.M. was tried for murder, convicted, and sentenced to forty-five years in prison. *Morrison v. State*, 503 S.W.3d 724, 725 (Tex. App.—Houston [14th Dist.] 2016, pet ref'd). Following the trial, he filed his first appeal of his conviction, which was assigned to the Fourteenth Court of Appeals.

Applying a then-recently decided case from the Texas Court of Criminal Appeals, *Moore v. State*, the Fourteenth Court of Appeals held that when, as here, a juvenile is arrested before he turns eighteen for a crime committed before he was seventeen, but the juvenile proceedings against him are concluded and an order of transfer issued after the person turns eighteen, not only must the State satisfy the factors under Texas Family Code section 54.02(a), on which the prosecutor in this case had relied, it must also prove that transfer is appropriate under section 54.02(j), which the State had not done because it mistakenly thought that section

2

54.02(j) did not apply. *Id.* at 727–28 (citing *Moore*[1] and explaining that section 54.02(j) applies when transfer occurs after person turns eighteen even if petition to transfer is filed before birthday). Accordingly, the Fourteenth Court ordered the juvenile court to hold a new transfer hearing to allow the State the opportunity to put on evidence in support of the transfer from which the juvenile court could reasonably conclude by a preponderance of the evidence that "for a reason beyond the control of the state it was not practicable to proceed in juvenile court before the 18th birthday of the person."[2] *Morrison*, 503 S.W.3d at 727–28; *see* TEX. FAM. CODE § 54.02(j)(4)(A); *Moore v. State*, 532 S.W.3d 400, 404–05 (Tex. Crim. App. 2017) (per curiam) (subsection 52.04(j)(4)(A) "is meant to limit the prosecution of an adult for an act he committed as a juvenile if his case could reasonably have been dealt with when he was still a juvenile").

This appeal is from the juvenile court's order on remand finding that it was not practicable to conclude the proceedings in juvenile court regarding the murder charge against A.M. before his eighteenth birthday. We review the transfer order

---

[1]  The Fourteenth Court cited *Moore v. State*, No. PD-1634-14, 2016 WL 6091386 (Tex. Crim. App. Oct. 19, 2016), which the Court of Criminal Appeals subsequently withdrew and replaced with a new opinion, *Moore v. State*, 532 S.W.3d 400 (Tex. Crim. App. 2017) (per curiam). The new opinion, however, did not change the rule on which our sister court relied. *Id.* at 405.

[2]  Subsection 52.04(j)(4) contains alternative grounds for waiver of jurisdiction by the juvenile court and transfer that all parties agree are not relevant to this appeal. *See* TEX. FAM. CODE § 54.02(j)(4)(B).

on remand to determine whether the juvenile court abused its discretion in making the practicability finding, waiving its jurisdiction, and transferring the case to criminal district court.

## Discussion

As the majority acknowledges, this appeal presents one issue: whether the juvenile court abused its discretion by finding that it was not "practicable" for reasons beyond the State's control for that court to have concluded proceedings commenced against A.M. before A.M.'s eighteenth birthday

I strongly disagree with the majority's handling and disposition of this case. The majority does not recite the detailed statutory requirements for reviewing transfer orders set out by the Court of Criminal Appeals in *Moon v. State*, 451 S.W.2d 28 (Tex. Crim. App. 2014), and by this Court in a number of recent cases, which are addressed below. The majority does not construe the term "practicable" in its opinion, although the case was remanded solely for a practicability finding; and it does not apply the Court of Criminal Appeals' construction of that term as used in Family Code section 54.02(j), which states that the conclusion of proceedings against a juvenile in juvenile court before his eighteenth birthday is "practicable" "*if his case could reasonably have been dealt with when he was still a juvenile." See Moore*, 532 S.W.3d at 405 (emphasis added).

4

Nor does it apply this standard as it was applied in *Moore*. Notably, the facts in *Moore*, which established the criteria for determining the practicability of completing proceedings against a juvenile before his eighteenth birthday are materially different in every respect from those in this case.  Specifically, (1) although the defendant in *Moore* was sixteen years old at the time of his sexual assault of his twelve-year-old cousin, "[t]he police investigation began soon thereafter with the investigating detective requesting reports from Child Protective Services and the hospital where the victim was examined"; (2) because the investigating detective had a heavy caseload and gave priority to other cases, she did not forward the case to the district attorney's office for almost two years; (3) the investigating detective believed that the defendant was seventeen years old, when he was actually eighteen, because of an error in one of the reports; and (4) the State took another year to file a petition for discretionary transfer of the case from juvenile court to criminal district court.  532 S.W.3d at 402.  The only reasonable inference from these facts in *Moore*, in the absence of evidence to the contrary, is that the State did nothing to prosecute the case for three years.

The majority applies its own standard of practicability that is contrary to law in multiple respects and in direct contravention of its own admonition that "the question [before this Court] is not whether we might have decided the issue differently." Slip Op. at 8 ("As with any decision that lies within the trial court's

5

discretion, the question is not whether we might have decided the issue differently") (citing *Moon*, 451 S.W.3d at 49).  And, rather than following the established standard of review of a juvenile court's findings in a transfer order or applying the construction of the term "practicable" as in *Moore*, as soon as it states the standard of review, the majority rejects the juvenile court's findings in favor of conducting its own independent evaluation of the facts and prosecutorial decisions made by law enforcement it finds relevant under its own unstated standard of review.

On this basis, the majority implicitly finds a legal duty of law enforcement officials and prosecutors to bring any charges they can against a juvenile as fast as they can without waiting for physical evidence, without going through regular police procedures for analyzing evidence, and without taking the ordinary professional course in completing the statutory pre-requisites to a transfer order once charges are filed.  It requires express findings on witness credibility and on what the witness *should have known* and done.  And it bases its decision that the district court abused its discretion in transferring the case on this substituted standard of review.

And to what end does the majority deem this heroic effort to be mandated in this case?  So that the juvenile court would not lose the option of sending A.M.—at least a three-time offender—to rehabilitation instead of transferring him to criminal

6

district court for trial for murder, which is all that is lost by holding a transfer hearing after a juvenile's eighteenth birthday. *See* TEX. FAM. CODE § 54.02(j); *Moore*, 532 S.W.3d at 404–05 (acknowledging that when juvenile turns eighteen, juvenile court does not lose jurisdiction, but its jurisdiction becomes limited, and it may then only either transfer case to appropriate court or dismiss it); *In re H.Y.*, 512 S.W.3d 467, 476 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (stating that material difference between proceeding under subsection 54.02(a) and proceeding under 54.02(j) "is that the juvenile court must consider the person's likelihood of rehabilitation if he is under 18, but is not required to consider it if the person is 18 or older").

In short, the majority sets a standard of review of a juvenile court's findings in support of a transfer order that contravenes established law and that violates every *reasonable* construction of the term "practicable" in order to assure that A.M.—and by extension all future juveniles—does not lose the benefit of having the juvenile court consider whether he should be sent to rehabilitation before his eighteenth birthday rather than being tried for murder as an adult—no matter how illusory the benefit in the actual case and no matter the efforts required to attain it. And it turns a blind eye to whether "the seriousness of the offense alleged or the background of [A.M.] warrant[ed] transfer for the welfare of the community,"

despite *Moon*'s mandate that the juvenile court's findings in a transfer order speak precisely to this ultimate issue, as well as to the best interests of the juvenile. *See* 451 S.W.3d at 50.

I would conclude, under the correct standard of review to the juvenile court's practicability finding, that the State met its burden on remand of showing that the conclusion of proceedings against A.M. in the juvenile court before his eighteenth birthday was not practicable. Accordingly, I would hold that the juvenile court did not abuse its discretion in so finding and in waiving its jurisdiction and transferring the case to criminal district court, and therefore it did not err. I would affirm the juvenile court's transfer of the murder case against A.M. to criminal district court for retrial.

## A. The Law Governing a Juvenile Court's Waiver of Jurisdiction and Transfer to District Court

A juvenile court has exclusive original jurisdiction over all proceedings involving a person who has engaged in delinquent conduct as a result of acts committed between the ages of ten and seventeen. *See* TEX. FAM. CODE §§ 51.02(2), 51.04(a).

Family Code section 54.02 governs the waiver of a juvenile court's exclusive original jurisdiction and transfer of the case to the appropriate criminal district court. TEX. FAM. CODE § 54.02. Section 54.02 provides in relevant part:

8

(j) The juvenile court may waive its exclusive original jurisdiction and transfer a child to the appropriate district court or criminal district court for criminal proceedings if [among other requirements]:

. . . .

(4) the juvenile court finds from a preponderance of the evidence that:

(A) for a reason beyond the control of the state it was not practicable to proceed in juvenile court before the 18th birthday of the person; or

(B) after due diligence of the state it was not practicable to proceed in juvenile court before the 18th birthday of the person because:

. . . .

(ii) the person could not be found. . . .

TEX. FAM. CODE § 54.02.[3]

Section 54.02 and related sections of the Family Code place numerous statutory protections for juveniles on the power of a juvenile court to waive jurisdiction and transfer proceedings to district court when, as here, a juvenile was fourteen years of age or older at the time he was alleged to have committed a felony of the first degree (here, murder under Penal Code Chapter 19) but had not turned eighteen when the proceedings in juvenile court were commenced. TEX. FAM. CODE § 54.02(j)(2)(A).

---

[3]  It is undisputed by the parties that subsection (j)(4)(B) is inapplicable.

Statutory prerequisites to transfer include the preliminary investigation and determinations and notice to parents required by Family Code section 53.01, which can only commence once there is probable cause to believe the juvenile engaged in delinquent conduct—a determination made here on January 27, 2012, and confirmed by the juvenile court's probable cause finding on January 31, 2012. *Id.* § 53.01(a). If, as here, the case is a felony, it must promptly be forwarded to the office of the prosecuting attorney along with all documents that accompanied the current referral and a summary of all prior referrals of the child for consideration by the juvenile board. *Id.* § 53.01(d)–(f).

The referral is then reviewed by the prosecutor, who must terminate all proceedings if there is no probable cause or return the referral to the juvenile probation department for further proceedings. *Id.* § 53.012. If the preliminary investigation reveals that further proceedings are authorized and warranted, rather than dismissal for lack of probable cause, the prosecuting attorney may file a court petition for an adjudication or transfer hearing with the juvenile court "as promptly as practicable," and may, prior to that, refer the offense to a grand jury to further investigate the facts and circumstances concerning the offense and approving prosecution. *Id.* §§ 53.04, 53.035.

The petition and notice requirements of sections 53.04, 53.05, 53.06, and 53.07 must also be satisfied. *Id.* § 54.02(b).

The juvenile court must then conduct a hearing without a jury to consider transfer of the child for criminal proceedings. *Id.* § 54.02(c). But, prior to the hearing, the juvenile court "shall order and obtain a complete diagnostic study, social evaluation, and full investigation of the child, his circumstances, and the circumstances of the alleged offense." *Id.* § 54.02(d); *see In re D.L.N.*, 930 S.W.2d 253, 255 (Tex. App.—Houston [14th Dist.] 1996, no pet.). At the transfer hearing, the court may consider written reports from probation officers, court employees, professional consultants, and witnesses; and, at least five days before the hearing, "the court shall provide the attorney for the child and the prosecuting attorney with access to all written matter to be considered by the court in making the transfer decision." TEX. FAM. CODE § 54.02(e).

The hearing's purpose is not to determine guilt or innocence but to establish whether the best interests of the minor and society are furthered by maintaining jurisdiction in the juvenile court or by transferring the minor to district court for adult proceedings. *In re D.L.N.*, 930 S.W.2d at 255. Accordingly, the juvenile court determines whether there is probable cause to believe that the minor committed the offense alleged and whether, because of the seriousness of the offense or the minor's background, the welfare of the community requires criminal proceedings. *Id.*

In making the transfer determination, the court must consider "(1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person"; "(2) the sophistication and maturity of the child"; "(3) the record and previous history of the child"; and "(4) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court." TEX. FAM. CODE § 54.02(f).

If the court waives jurisdiction, it must "state specifically in the order its reasons for waiver and certify its action, including the written order and findings of the court, and shall transfer the person to the appropriate court for criminal proceedings," and cause the psychological study to be transferred to the appropriate criminal prosecutor. *Id.* § 54.02(h). "A transfer of custody made under this subsection is an arrest." *Id.*

When a juvenile is arrested before he turns eighteen for a crime committed before he turned seventeen, but the transfer hearing is held after the juvenile's eighteenth birthday, the juvenile court must make the findings required by subsection 54.02(j) in addition to the findings required by subsection 54.02(a). *Morrison*, 503 S.W.3d at 272–28. Section 54.02(j) provides that, if the prerequisites to completion of the proceedings in juvenile court cannot reasonably be dealt with before the person's eighteenth birthday, the juvenile court may hold

12

the transfer hearing after the person's birthday, waive its exclusive original jurisdiction, and transfer the person to criminal district court if (1) the person is eighteen years of age or older; (2) the person was between ten and seventeen years of age at the time he is alleged to have committed an offense such as one under Penal Code section 19.02 (Murder); (3) no adjudication concerning the alleged offense has been made or adjudication hearing concerning the offense conducted; (4) the court finds from a preponderance of the evidence that it was not practicable to proceed in juvenile court before the child's eighteenth birthday; and (5) the juvenile court determines there is probable cause to believe the child committed the offense alleged. *Id.* § 54.02(j).

That was the case here. Specifically, the juvenile court was required to find facts (1) from which it could reasonably be inferred that the State conducted a diligent investigation to discover and bring to justice the killer of the complainant, Kristian Sullivan or "K-Su," between the time K-Su was murdered and the time A.M. was identified as a participant in the murder, physical evidence linking him to the crime was found and processed, and probable cause was developed to arrest him and (2) from which it could reasonably be inferred that the statutorily-mandated prerequisites to transfer could not reasonably have been dealt with in the eight weeks between the time probable cause to arrest A.M. was obtained and his eighteenth birthday.

Only, here, the juvenile court did not make its finding that it was not practicable to proceed in juvenile court before A.M.'s eighteenth birthday on the record at the original hearing in 2012, as required by section 54.02(j)(4). The Fourteenth Court of Appeals' remand of the case to the juvenile court in 2016 was specifically to allow the juvenile court the opportunity to hold another transfer hearing and to make the omitted findings on the basis of the preponderance of the evidence standard.

**B.      Standard of Review of Order Transferring Proceedings from Juvenile Court to Criminal District Court**

Appellate courts review a juvenile court's order waiving its jurisdiction and transferring proceedings to criminal district court under an abuse of discretion standard. *See Moon*, 451 S.W.3d at 40 (holding that State has burden "to produce evidence to inform the juvenile court's discretion as to whether waiving its otherwise-exclusive jurisdiction is appropriate in the particular case"); *Moore v. State*, 446 S.W.3d 47, 50 (Tex. App.—Houston [1st Dist.] 2014), *aff'd*, 532 S.W.3d 400 (Tex. Crim. App. 2017); *Matthews v. State*, 513 S.W.3d 45, 55–56 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (relying on *Moon*); *In re H.Y.*, 512 S.W.3d at 479.

The Court of Criminal Appeals explained the appellate courts' standard of review of a lower court's findings of fact and conclusions of law in an order

transferring proceedings from juvenile court to criminal district court in *Moon.*
Under this standard,

> In deciding whether the juvenile court erred to conclude that the seriousness of the offense alleged and/or the background of the juvenile called for criminal proceedings for the welfare of the community, the appellate court should simply ask, in light of its own analysis of the sufficiency of the evidence to support the Section 54.02(f) factors and any other relevant evidence, whether the juvenile court acted without reference to guiding rules or principles. In other words, was its transfer decision essentially arbitrary, given the evidence upon which it was based, or did it represent a reasonably principled application of the legislative criteria?

*Moon*, 451 S.W.3d at 47; *Matthews*, 512 S.W.3d at 56.

*Moon* emphasized the importance of the juvenile court's making the determinations required by section 54.02 before waiving its jurisdiction and transferring the case. *See* 451 S.W.3d at 46–47 (citing TEX. FAM. CODE § 54.02(a)); *see also In re T.S.*, 548 S.W.3d 711, 720 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (discussing standard set out in *Moon*). The *Moon* court, like the *Moore* court after it, "made clear that . . . if the juvenile court waives jurisdiction, it must 'state specifically' in its order its reasons for waiver." *In re T.S.*, 548 S.W.3d at 721 (quoting *Moon*, 451 S.W.3d at 41). It must "spread[] its deliberative process on the record, thereby providing a sure-footed and definite basis from which an appellate court can determine that its decision was in fact appropriately guided by the statutory criteria, principled, and reasonable." *Id.* (quoting *Moon*, 451 S.W.3d at 49).

Each case from this Court that has reviewed findings of fact and conclusions of law in regard to a waiver of juvenile court jurisdiction and transfer to district court has followed *Moon*. *See, e.g.*, *id.* In several recent opinions, this Court has specified that, in a transfer case, the juvenile court must consider and make findings in the transfer order as to each of the four statutory factors set out in Family Code section 54.02(f), which are recited above. *See id.*; *Ex parte Arango*, 518 S.W. 3d 916, 920–21 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd); *see also Matthews*, 513 S.W.3d at 55–56 (ruling of Fourteenth Court of Appeals, holding same). In addition, as stated above, if section 54.02(j) applies—i.e., if the transfer hearing takes place after the person's eighteenth birthday—the juvenile court must also make the findings required by subsection 54.02(j), including the practicability finding that is at issue here.

"[I]n evaluating a juvenile court's decision to waive its jurisdiction, an appellate court should first review the juvenile court's specific findings of fact regarding the Section 54.02(f) factors under 'traditional sufficiency of the evidence review.'" *Moon*, 451 S.W.3d at 47; *see In re T.S.*, 548 S.W.3d at 721. Specifically,

> [I]n conducting a review of the sufficiency of the evidence to establish the facts relevant to the Section 54.02(f) factors and any other relevant historical facts, which are meant to inform the juvenile court's discretion whether the seriousness of the offense alleged or the background of the juvenile warrants transfer for the welfare of the community, *the appellate court must limit its sufficiency review to the facts that the juvenile court expressly relied upon, as required to be explicitly set out in the juvenile transfer order* under Section 54.02(h).

*Moon*, 451 S.W.3d at 50 (emphasis added); *In re T.S.*, 548 S.W.3d at 722. This Court stated emphatically in *Matthews*: "The *Moon* court . . . emphasized that . . . if the juvenile court waives jurisdiction it must 'state specifically' in its order its reasons for waiver," and we concluded that "we 'should *not* be made to rummage through the record for facts that the juvenile court *might* have found, given the evidence developed at the transfer hearing, but did not include in its written transfer order.'" 513 S.W.3d at 56 (quoting *Moon*, 451 S.W.3d at 49–50) (emphasis in original).

I am also mindful of the standard for reviewing mixed questions of law and fact set out by the Court of Criminal Appeals in *State v. Garcia*. In that case, the Court of Criminal Appeals addressed in detail the standard of appellate review when "the trial judge is required to make findings of fact and conclusions of law expressing the basis for his ruling." *State v. Garcia*, 569 S.W.3d 142, 148 (Tex. Crim. App. 2018). The court recited the established standard:

> *Reviewing courts should afford "almost total deference" to the trial judge's findings on matters of historical fact*, especially when those findings "are based on an evaluation of credibility and demeanor." But "application[s] of law to fact" or "mixed questions of law and fact" are entitled to deference only if they "turn[] on an evaluation of credibility and demeanor." Otherwise, they are reviewed de novo.

*Id.* (internal citations omitted) (emphasis added).

17

*Garcia* centered around "interrelated issues" raising questions as to "(1) . . . which of the trial judge's findings and conclusions are entitled to deference; (2) which of the trial judge's findings and conclusions are reviewable de novo; and (3) which of the trial judge's findings and conclusions are relevant to determining [the ultimate question]." *Id.* at 148–49. The court therefore determined to "lay out some of the factors that informed the trial judge's decision in this case and attempt to describe, item by item, both the deference owed to the trial judge in that regard and the relevance each item should have in determining [the ultimate question]." *Garcia*, 569 S.W.3d at 149.

In particular, *Garcia* instructs, "*in assessing the reasonableness of an officer's actions* [under the circumstances and law of the case] *a reviewing court should take into account not only the facts known to the officer, but also the 'specific reasonable inferences which he is entitled to draw from the facts in light of his experience*,'" necessitating "an inquiry into whether a particular inference was, or was not, 'reasonable' under the circumstances." *Id.* at 151 (emphasis added). However, as the Court of Criminal Appeals pointed out, this "finding" of reasonableness is not a finding at all, but a legal conclusion, and is, therefore, subject to de novo review. *Id.*

The exact same sorts of interrelated issues that characterized *Garcia* are involved here in determining whether the juvenile court abused its discretion in

18

concluding, on the basis of reasonable inferences from findings of historical fact, that the State proved by a preponderance of the evidence that concluding proceedings in the juvenile court before A.M.'s eighteenth birthday was not practicable. Here, as in *Garcia*, the juvenile court's findings of historical facts, as long as they find support within the record, are entitled to deference and are "highly relevant" to deciding the legal issues, as they "clearly and properly informed the trial judge's determination of whether there was time" to conclude juvenile proceedings before A.M.'s eighteenth birthday. *See id.* at 149.

The majority in this case reverses the mandates of the Court of Criminal Appeals. It not only fails to follow but *rejects* the notion of limiting its sufficiency review to the facts that the juvenile court expressly relied upon. It reviews the sufficiency of the evidence according to what it thinks *should* have been facts upon which the juvenile court based its review and alternative courses of action *not* taken but that it deems *should have been* taken and *would have been* sufficient, in its judgment, to justify a practicability finding. And it rummages through the record "for facts the juvenile court *might* have found, given the evidence developed at the transfer hearing, but did not include in its written transfer order,'" exactly contrary to *Matthews*. *See* 513 S.W.3d at 56.

The majority does not defer to the trial court's findings and reasonable inferences therefrom. It ignores many of the pertinent facts showing both what the

19

officers did and what activities the State was required to complete to prepare for the transfer hearing. Instead, it concludes that the trial court's fifty findings of fact in support of its transfer order are all simply irrelevant because they are not findings that meet the majority's own criteria. That is, the findings do not state that the juvenile court found witnesses credible, and they do not state that it was not practicable (under its unexplained criterion of "practicability"), i.e., humanly possible, to complete proceedings in the juvenile court had every heroic measure and short-cut possible been undertaken to complete the case against A.M. before his eighteenth birthday, even if it meant arresting A.M. as soon as the investigating officer thought he had probable cause to arrest him under the law of parties, even though, in that officer's judgment, it was important to get physical evidence to tie A.M. to the scene of the crime, and even if it meant rushing scientific studies of the evidence of the crime and not waiting for the completeness report, and even though the case must be dismissed if the juvenile court determines the probable cause standard was not met.

In the majority's analysis, the investigation and proceedings should have been driven solely by the fact that A.M.—one of many persons identified in connection with the complainant's gang-related murder over the course of the sweeping investigation—would turn eighteen five months after he was first placed by witnesses at the scene of the murder and so he must be arrested and charged as

the murderer, regardless of the state of the proof, and all necessary prerequisites to transfer completed before his birthday or the proceedings against him would be dismissed.

Likewise, the majority does not take into account the *reasonableness* of the inferences the investigating officers were entitled to draw "under the circumstances" in light of their experience, and that the juvenile court was allowed to credit, as instructed by *Garcia*. *See* 569 S.W.3d at 150. These would include, for example, the inference that it was reasonable to allow the investigative process to take its normal course to its conclusion and that, therefore, it was unnecessary to arrest A.M. in October 2011, since he was already in juvenile detention, and that it made sense to seek physical evidence linking him to the crime scene to support a probable cause statement in his affidavit and to analyze the evidence found under standard law enforcement procedures, and thereby to determine the truthfulness of A.M.'s identification by witnesses as being at the murder scene and the extent of his involvement in the crime in order to enhance the chances that the probable cause finding indispensable to criminal prosecution would be made by the juvenile court.

The majority substitutes its own judgment for the officer's and determines that everything the officers did was *unreasonable* by the majority's own standards, which are honed in solely on meeting the deadline for concluding proceedings in

21

juvenile court before A.M.'s eighteenth birthday. Nor does the majority defer at all to the juvenile court's historical findings of fact, although mandated to afford them almost total deference by *Garcia*. *See* 569 S.W.3d at 148; *see also Moon*, 451 S.W.3d at 49–50 (holding that reviewing court should measure sufficiency of evidence to support juvenile court's stated reasons for transfer by considering sufficiency of evidence to support facts as they are expressly found by juvenile court in its certified order).

There could be no clearer case of an appellate court "'rummag[ing] through the record for facts that the juvenile court *might* have found, given the evidence developed at the transfer hearing, but did not include in its written transfer order,'" exactly contrary to *Moon* and *Matthews*. *See Matthews*, 513 S.W.3d at 56 (quoting *Moon*, 451 S.W. 3d at 50). And there could be no clearer case of an appellate court's second-guessing both the investigators and the discretion of the juvenile court in implicitly finding that the gap following the time Lieutenant Terry was first told by Wilbourn that "Tony T" (A.M.) had tried to sell him "the gun 'that was used to kill ole boy,'" Slip Op. at 11, was immaterial to its decision that it was not practicable to conclude the proceedings in juvenile court before A.M.'s eighteenth birthday. *See In re J.W.W.*, 507 S.W.3d 408, 413 (Tex. App.—Houston [1st Dist.] 2016, no pet.) ("As with any decision that lies within the discretion of

the juvenile court, the salient question is not whether we might have decided the issue differently.") (citing *Moon*, 451 S.W.3d at 49).

At the same time, the majority fails almost entirely to opine on the many statutory prerequisites that had to be fulfilled after the investigation was completed and A.M. was transferred to Harris County from detention in Fort Bend County and detained on the murder charge and before the decision to transfer the case to criminal district court could be made, except to find it unreasonable for the juvenile court not to have required an expedited psychological study of A.M. The majority does not concern itself with what it might have taken for the juvenile court to obtain that report before March 27, when it was delivered. And it is heedless of the time required to complete other statutory requirements, including not only "a complete diagnostic study," but also a "social evaluation, and full investigation of the child, his circumstances, and the circumstances of the alleged offense," the collection of "written reports from probation officers, professional court employees, . . . professional consultants," and other witnesses, and the provision to the attorney for the child and the prosecuting attorney of "all written matter to be considered by the court in making the transfer decision." TEX. FAM. CODE § 54.02(c), (d), (e).

Nor does the majority consider the determination the juvenile court was required to make before ordering the proceedings against A.M. transferred to

23

criminal district court, which is to answer the question whether the best interests of the minor and *also* the best interests of society are furthered by maintaining jurisdiction in the juvenile court or by transferring the minor to district court for adult proceedings because of the seriousness of the offense or the minor's background and the welfare of the community. *In re D.L.N.*, 930 S.W.2d at 255. It is to assist the juvenile court in making these determinations that the court is required by law to consider the four factors set out in section 54.02(f)—including "the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court"—as well as, when the transfer hearing is not held before the juvenile's eighteenth birthday, whether the proceedings could reasonably have been dealt with in juvenile court before the minor's eighteenth birthday. *See Moore*, 532 S.W.3d at 404–05; *In re D.L.N.*, 930 S.W.2d at 258.

Under the established standard of review, the majority could not have reasonably concluded that the juvenile court abused its discretion in finding that it was not practicable to conclude the proceedings in juvenile court before A.M.'s eighteenth birthday, and it could not have reasonably concluded that A.M.'s rights were trampled in this case, that he should be protected against criminal prosecution, and that criminal proceedings against him must be dismissed, regardless of the threat he poses to the community.

I would decide this case under the governing standards of review of a juvenile court's transfer order set out above. *See Moore*, 532 S.W.3d at 405; *Moon*, 451 S.W.3d at 46–47. I would afford almost total deference to the historical findings of fact of the juvenile court, and I would review de novo mixed questions of law and fact to determine whether they support the juvenile court's conclusions as reasonable. *See Garcia*, 569 S.W.3d at 148–49; *see also Moon*, 451 S.W.3d at 46–47 ("As long as the appellate court can determine that the juvenile court's judgment was based upon facts that are supported by the record, it should refrain from interfering with that judgment absent a scenario in which the facts identified in the transfer order . . . bear no rational relation to the specific reasons the order gives to justify [its findings]."). I would determine that the juvenile court did not abuse its discretion in ordering transfer of the proceedings against A.M., and I would enter judgment accordingly.

## C. The Juvenile Court's Findings of Fact and Transfer Order

The juvenile court made fifty findings following A.M.'s transfer hearing to determine whether it was practicable to conclude the proceedings against him in juvenile court before his eighteenth birthday. These findings and the record evidence present the following scenario.

### 1. Law enforcement's investigation of Sullivan's murder

On April 20, 2010, A.M. was placed on juvenile probation for an unrelated crime in Harris County, Texas. The probation was transferred to Fort Bend County for supervision.

On August 26, 2010, the complainant, seventeen-year-old Kristian Sullivan, who was a member of the gang "Forever About Bread" and also known as "K-Su," was shot multiple times by an unknown assailant and killed outside his home in Missouri City, Texas, in a gang-related shooting. No weapons were found at the scene, and no eye-witnesses came forward. Two different brands of cartridge casings were found, but they were of the same caliber. The police suspected, but were not sure, that there were two gunmen. At the time of Sullivan's murder, A.M. was sixteen years and five months old.

Before Sullivan's death, there had been "numerous, numerous crimes, shooting, fights, that were going on" between feuding gang members. While police were still on the scene of Sullivan's murder, another shooting occurred at the home of a rival "100 Clikk" gang member. The shooting appeared to be in retaliation for Sullivan's murder.

During the intensive investigation of the second murder that immediately followed Sullivan's killing, several members of the 100 Clikk gang were identified

as persons of interest, including "Black Mike," who was identified by gang member Darius Pye on August 28.

On August 30, 2010, A.M. was detained by the Missouri City Police Department on an unrelated charge.

On September 1, the police identified Black Mike as Michael Wilton and interviewed him. He provided a possible alibi. The investigation continued, and other suspects were identified and interviewed.

On September 7, two weeks after the killing, the police requested grand jury subpoenas for phone records of the complainant in an attempt to generate leads. They continued to interview gang members and to follow up on leads.

On September 16, police sent gunshot residue collected from one suspect to a lab for testing.

On October 11, they collected Sullivan's clothing from the Medical Examiner's office and found an additional cartridge casing.

On October 25, A.M. was placed on formal juvenile probation on an unrelated charge.

The lack of evidence and the reticence of gang members to speak with the police made the murder investigation difficult. Sullivan was "very involved" in the leadership of the FAB gang. Sullivan's residence was typically where FAB gang members would "hang out." Sullivan's friends were not cooperative with the

police; there was testimony at the transfer hearing that "traditionally gang members don't just come to police with information." Police had multiple names of suspects, but researching those names, and generating and corroborating information, took substantial time. Although not included in the findings of fact, the record shows that Police Sergeant K. Tullos testified that any member of 100 Clikk "would be a possible suspect at the time." Around the time of Sullivan's murder, 100 Clikk had about 300 members.

A.M.'s name was first mentioned on December 6, 2010, by a senior member of 100 Clikk, Michael Wilbourn, who was then in federal custody for aggravated robbery. Wilbourn identified "Tony T" as a person who wanted to sell him "a gun used to kill ole boy." Missouri City Police Lieutenant R. Terry testified that Wilbourn did not implicate himself in the murder and was not credible. At that point, there was nothing to corroborate Wilbourn's statement, but Lieutenant Terry "still [had] to follow up on his statement just to verify."

Police learned that Tony T's real name was A.M. A.M. was a student at Marshall High School, and he lived just outside Missouri City. Lieutenant Terry went to A.M.'s address, but he found a vacant house. Lieutenant Terry later learned that A.M. was in juvenile detention in Fort Bend County, but he did not speak with A.M. at that time. Lieutenant Terry then learned that A.M. had been released from juvenile detention on December 8, 2010. Lieutenant Terry did not

attempt to locate A.M., in part because he did not believe he could get information about a juvenile on probation.

From December 2010 through June 2011, both the Missouri City Police Department gang unit and the tri-city Special Crimes Unit (SCU) conducted multiple gang sweeps, attempted widespread gang documentation, and ran organized patrol action plans in an attempt to suppress gang activity, document gang members, and generate leads in Sullivan's murder. The SCU was "busy"— over 100 gang members were entered into the Department of Public Safety database during this time, and a lot of information was coming in.

During this time, on March 30, 2011, A.M. turned seventeen. On May 9, 2011, A.M. was committed to the Texas Juvenile Justice Department (TJJD) on an indeterminate commitment for an unrelated felony.

On June 3, 2011, police returned to A.M.'s last known home address, were again unable to make contact with him, and learned that the house had been sold at foreclosure.

Also on June 3, 2011, in anticipation of the promotion of the lead investigator, the Missouri City Police Chief turned the investigation over to the SCU.

On June 10, police attempted to generate leads by submitting evidence to be entered into the DNA database.

On June 13, SCU investigators spoke to 100 Clikk member Darius Pye, "a respected high-ranking gang member," who implicated a fellow gang member, Sterlyn Edwards, in the murder. Pye said that, after the murder, he was in a car driven by Edwards, who was talking on the phone to a rival FAB gang member. According to Pye, Edwards told the rival gang member, "I'll bang, bang you like I bang, bang K-Su." The record reflects that the police considered this to be the first break in the case, but this information still needed to be corroborated.

On August 18, 2011, SCU investigators met with Donald Reed, another member of 100 Clikk, who said that Darius Downer, also a member of 100 Clikk, had told him that Edwards shot Sullivan. The investigators spoke with Downer, who said that Edwards had tried to sell him a gun after Sullivan's murder. Downer was the second 100 Clikk member to implicate Edwards, a fellow 100 Clikk member, and investigators thought this information was credible.

SCU investigators learned that a week before Sullivan's murder someone named "Rene" was shot at Downer's house by FAB gang members. Investigators met with Rene, who was still recovering from his gunshot wound. Rene said one of his best friends was A.M. The record reflects that the information that one of A.M.'s best friends had been shot by FAB gang members provided the officers with a possible motive for Sullivan's murder.

On August 23, 2011, investigators went to speak with Wilbourn. Since his December 2010 interview, Wilbourn had been convicted of bank robbery and was then serving a fifteen-year prison sentence. Wilbourn implicated 100 Clikk in Sullivan's murder. Wilbourn told investigators that Edwards was involved in the murder of Sullivan and that A.M. had tried to sell him a gun that A.M. claimed was involved in the murder. Wilbourn said that Edwards and A.M. had borrowed a tan or cream Ford Taurus from some girls from Pearland and that they drove that car to commit the murder.

On August 29, investigators interviewed FAB gang member Allen Henderson. Henderson said that, during a phone conversation he had had with Edwards, Edwards threatened to "bang, bang him like he did K-Su." The record reflects that Henderson gave no information about A.M.

On October 11, 2011, having learned that Edwards was incarcerated in the Texas Department of Criminal Justice (TDCJ), investigators interviewed Edwards for the first time. During the interview, Edwards implicated himself and two other gang members—A.M. and Joshua Patterson, or "J-Pat"—in Sullivan's murder. Edwards said that he arranged for Patterson and A.M. to buy marijuana from Sullivan. After Edwards set up the marijuana deal, Kandace Hall drove Patterson and A.M. to Sullivan's house, where they committed the murder. The record

31

reflects that this was the first time that investigators actually considered A.M. to be a suspect in Sullivan's murder.

On October 14, 2011, investigators spoke with Samon Williams. She stated that she used to own a tan or pewter Ford Taurus, which matched the description provided by Wilbourn in the August 2011 interview and that it was used in the murder. The record contains her testimony that, on the night Sullivan was killed, Williams was hanging out at A.M.'s house with A.M., Patterson, and Hall, among others. Williams said that Hall, Patterson, and A.M. left the house in her car but she knew something was going on, so she stayed back and went to her boyfriend's house down the street. When Hall, Patterson, and A.M. returned, Edwards was with them. Later that night, Williams and Hall dropped off A.M., then they dropped off Edwards, and finally they dropped off Patterson. When they arrived at Patterson's house, Patterson put a gun in the hood of the car, and Hall told Williams that the gun was used to "kill that boy."

On October 15, 2011, investigators interviewed Hall, who corroborated Williams's statement and said she drove with A.M., Patterson, and Edwards to Sullivan's house. The record contains Hall's testimony that, on the night of the shooting, they were at A.M.'s house, and A.M. and the other gang members were talking about something in gang language or jail code, which she did not understand. Hall went on the marijuana run with them, noting that Patterson was

32

driving the car and that Edwards and A.M. were passengers. When they arrived at Sullivan's house to buy the marijuana, Edwards and A.M. got out of the car. Hall then heard several gunshots, and Edwards and A.M. came running back to the car. Edwards told them to "go, go, go" and indicated that he had shot someone.

Sergeant Ramirez considered the information given by Williams and Hall credible. However, neither of them saw A.M. shoot Sullivan or saw him hold a gun. Still, the use of two different brands of ammunition to shoot Sullivan indicated there might have been two shooters.

The record also contains the chief investigator's testimony that, after speaking with Williams and Hall, he believed that Edwards, Patterson, and A.M. were all involved in the murder, at least as parties to the offense. But he did not believe the police were ready to request warrants for arrests. He testified that he still needed to speak with Patterson, who he believed acted as the getaway driver.

On October 21, 2011, an automobile was identified as being involved in the murder.

On October 25, 2011, investigators met with Patterson at the police department. Patterson gave a statement that corroborated the statements of Williams and Hall. Patterson's statements were consistent with there being two shooters.

That same day, Sergeant Ramirez obtained an arrest warrant for Patterson, and he was subsequently arrested. The record contains the chief investigator's testimony that because both Edwards and A.M. were already in custody,[4] he was not concerned with getting warrants for their arrest in this case. Patterson was the only person who participated in the murder who was not already in custody and therefore could potentially hurt the female witnesses who had provided evidence against the suspects. Also, at that point, the investigator was concerned that he had no physical evidence to corroborate A.M.'s involvement. Investigators were waiting on laboratory results regarding DNA testing on the shell casings and firearms examinations.

On October 26, 2011, officers located Williams's Taurus, which four witnesses—Wilbourn, Williams, Hall, and Patterson—had said was used in the murder. The Taurus had been repossessed and resold, but it was recovered and processed for blood evidence and anything related to the murder. It contained no evidence.

On October 31, 2011, the investigators referred the whole case to the Fort Bend County District Attorney's Office and filed an offense report recommending that A.M., Patterson, and Edwards be arrested and charged with murder. However, the record reflects that the lead investigator did not sign a probable cause affidavit

---

[4]     At the time, A.M. was still detained by TJJD.

or obtain a directive to apprehend A.M. at that time. Rather, he testified that, although his October 2011 report requested A.M.'s arrest, he did not intend to arrest A.M. at that time because he needed "some physical evidence to help corroborate" the testimony against him.

On November 3, 2011, the firearms examiner began a firearms analysis of the casings evidence.

The next day, November 4, Turner, the firearms examiner, completed her analysis and reached a preliminary opinion that two guns had been used in the murder.

On November 17, 2011, a required "technical review" of the examination was conducted and the results were then available for verbal release.

On January 11, 2012, a DNA report was completed showing negative results for blood on swabs from the car. No evidence was found in the Taurus.

On January 27, a required final administrative review of the firearms examination was conducted and released to the police.

That same day, investigators received a verbal confirmation from the firearms lab that two guns had been used in the murder. This was the first physical evidence to indicate that there were two shooters.

Investigators immediately obtained a formal directive to apprehend A.M. *See* TEX. FAM. CODE § 52.015(a) ("On the request of a law-enforcement or

probation officer, a juvenile court may issue a directive to apprehend a child if the court finds there is probable cause to take the child into custody under the provisions of this title.").

### 2. *A.M.'s arrest and proceedings in juvenile court*

On January 30, 2012, three days after the directive to apprehend A.M. was issued and eight weeks before his eighteenth birthday, the directive to apprehend was executed at TJJD, and A.M. was taken to Fort Bend County Juvenile Detention.

On February 1, 2012, an initial detention hearing was held in Fort Bend County and a finding of probable cause made.

On February 13, 2012, six weeks before A.M.'s eighteenth birthday, the State filed its petition for a discretionary transfer to criminal district court under Family Code section 54.02 and a motion for a psychological examination pursuant to section 54.02(d).

On February 22, 2012, the juvenile court ordered a psychological evaluation of A.M. *See id.* § 54.02(d) ("Prior to the hearing [on the petition for transfer], the juvenile court shall order and obtain a complete diagnostic study, social evaluation, and full investigation of the child, his circumstances, and the circumstances of the alleged offense."). The juvenile court appointed Dr. Karen Gollaher to conduct the evaluation, based on her educational background and experience in conducting

36

psychological examinations pursuant to section 54.02. The court ordered "a full and thorough study of the background and circumstances of [A.M.]," but information Gollaher needed for her evaluation was not sent to her by the Fort Bend County Juvenile Probation Department for more than a month.

On March 26, 2012, due to A.M.'s impending eighteenth birthday, the State requested and the juvenile court signed an order that A.M. be transferred from Fort Bend County Juvenile Detention to Fort Bend County Jail, as the former does not house adults. The next day, the Probation Department's Psychology Division forwarded to Gollaher the information she needed for her psychological evaluation.

On March 30, 2012, A.M. turned eighteen.

On April 5, 2012, Dr. Gollaher performed her psychological evaluation of A.M. She completed her report later that month, and the juvenile court released the report to all parties.

The record reflects that, on June 8, 2012, A.M.'s assigned juvenile probation officer, Heather Boswell, completed her social home study report, which could not be completed before receipt of the psychological evaluation.

On June 12, 2012, the juvenile court held a hearing on the State's petition to transfer. The record reflects that the prosecutor described the hearing as "a traditional discretionary transfer hearing." The prosecutor observed that A.M. had turned eighteen on March 30 but that the State had filed its petition for

discretionary transfer while A.M. was seventeen years old. The prosecutor argued—based on the prosecutor's understanding of the statute at the time—that the juvenile court's decision whether to transfer the case was governed by section 54.02(a), not section 54.02(j), which the prosecutor believed only applied when the State files its petition to transfer after the juvenile's eighteenth birthday. According to the prosecutor, because the petition was filed "well before" A.M.'s eighteenth birthday, section 54.02(j) was "never triggered." *But see Morrison*, 503 S.W.3d at 727–8 (holding that Section 54.02(j) applies when transfer occurs after defendant turns eighteen even if petition is filed before birthday).

On June 13, 2012, following the hearing, the juvenile court waived its jurisdiction and ordered the case transferred to criminal district court, where A.M. was tried, convicted, and sentenced to forty-five years in prison.

A.M. appealed his conviction to the Fourteenth Court of Appeals, which found that the juvenile court had abused its discretion in waiving its jurisdiction and transferring the case to criminal district court without making the findings required by section 52.04(j), vacated the criminal district court's judgment and A.M.'s sentence, and ordered the case remanded to the juvenile court for a finding as to whether conclusion of the proceedings in juvenile court was not practicable before A.M.'s eighteenth birthday. That court found on remand that it was not practicable to have completed the proceedings against A.M. before his eighteenth

38

birthday, and it again waived its jurisdiction and transferred the case to district court. A.M. again appealed.

**D. Review of the Juvenile Court's Order for Abuse of Discretion**

I would review the juvenile court's findings of fact and conclusions of law on the practicability of concluding proceedings in the juvenile court before A.M.'s eighteenth birthday to determine whether the juvenile court's finding that all law enforcement, prosecutorial, and juvenile proceedings could not "reasonably have been dealt with" prior to A.M.'s eighteenth birthday was itself reasonable. I would include in that determination "whether a reasonable law-enforcement inference was available on particular facts," as this "is often highly relevant to resolving [legal] issues [such as those in this case]." *Garcia*, 569 S.W.3d at 152. If reasonable, the law enforcement officers' and the trial court's inferences should be considered in determining whether, as a matter of law, the State proved its case. *See id.* I would also be mindful of the Court of Criminal Appeals' instruction that, "[o]nce the preceding matters are settled, the trial judge should finally decide whether, in light of the known facts and reasonable inferences therefrom, an objectively reasonable officer [of the court] would conclude that" completion of juvenile proceedings before A.M.'s eighteenth birthday was practicable. *See id.* And I would be mindful that we review this inquiry de novo. *See id.*

Having reviewed the reasonableness of law enforcement's investigation and prosecution of the case de novo, as reflected in the record, and having reviewed the juvenile court's findings of fact for their reasonableness in light of *Moore*, I would conclude that all of the factors present here show that, for reasons beyond the control of law enforcement and the prosecutors, A.M.'s case could not reasonably have been dealt with when he was still a juvenile. These factors include the length of time required to identify A.M. as a suspect, to identify his role in the murder, to identify the vehicle used to transport the murderers to the murder scene, to inspect the vehicle fruitlessly for physical evidence, to discover casings from the murder scene and to send them to the firearms examiner for a complete examination in accordance with standard law enforcement procedures before it could be determined that A.M.'s weapon was used in the murder, and, after A.M. was identified as a shooter, to transfer him from detention in Fort Bend County to Harris County, to hold a hearing and find probable cause to charge and detain him, and to fulfill all the statutory prerequisites to transfer or dismissal of the charges in accordance with professional standards. *Cf. Moore*, 532 S.W.3d at 402.

I would conclude that the juvenile court correctly determined that the conclusion of juvenile court proceedings before A.M.'s eighteenth birthday was not practicable under the circumstances of this case and its order waiving its jurisdiction and transferring the murder case against A.M. to district court were

40

both reasonable in that its determinations was based on known facts and reasonable inferences therefrom. *See Garcia*, 569 S.W.3d at 152. Accordingly, I would hold that the juvenile court did not abuse its discretion in waiving its jurisdiction and transferring the murder case against A.M. to criminal district court.

## Conclusion

I would affirm the order of the juvenile court transferring the case against A.M. to criminal district court pursuant to Family Code section 54.02.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Landau.

Justice Keyes, dissenting.