**Affirmed and Memorandum Opinion filed May 21, 2024.**



**In the**

# Fourteenth Court of Appeals

---

**NO. 14-22-00836-CR**

---

**MARCUS LEVAIL MURPHY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 230th District Court
Harris County, Texas
Trial Court Cause No. 1468718**

---

## M E M O R A N D U M   O P I N I O N

In appealing his conviction for capital murder, appellant Marcus Levail Murphy argues that the evidence is legally insufficient to support the verdict; that the trial court abused its discretion in admitting evidence extracted from victim Ebony Harris's cell phone; and that the trial court denied appellant his constitutional right to present a defense by excluding certain hearsay. We affirm.

# I. BACKGROUND

In the weeks leading up to her death, complainant Ebony Harris was romantically involved with appellant, who was then a member of the U.S. Navy living in the area around Chesapeake, Virginia. Less than a week after learning she was pregnant with twins, Harris was found murdered in her Houston apartment. She had been strangled and repeatedly stabbed. There were defensive wounds on her hands, and appellant's DNA was under her fingernails.

We first summarize the uncontroverted evidence before addressing conflicting evidence that was admitted or offered by appellant.

## A.    Uncontroverted Evidence

The evidence presented at trial showed that at around 2:00 a.m. on Thursday, February 19, 2015, Ebony Harris texted appellant, "OMG. I'm so scared." The response message from appellant's phone asked if Harris was okay. She answered, "No. I'm pregnant with twins." Appellant, who had been dating Harris, lived at that time in Virginia with his wife and their children—also twins.

Appellant bought two pairs of gloves at a Wal-Mart in Danville, Virginia on the night of February 23, 2015, then drove to Charlotte International Airport, arriving at around 1:00 a.m. on February 24th. Appellant and his cousin then flew together to Houston with a layover in Detroit. They arrived at Bush Intercontinental Airport in Houston shortly after 11:00 a.m.

Data extracted from appellant's cell phone showed that appellant arrived in the area around Harris's apartment at 11:56 a.m., about twenty minutes after Harris ended a phone call with her mother. There is no further user-generated activity from Harris's phone after this time.

2

Starting at around 12:40 p.m., there were incoming and outgoing calls between appellant's cell phone and a taxi service. An hour later, he arrived back at Intercontinental Airport. At 3:13 p.m., appellant and his cousin boarded a flight back to Charlotte, Virginia by way of Atlanta.

Harris failed to appear for work at 2:00 p.m. as scheduled, and she did not contact her employer or her half-sister, who was babysitting Harris's four-year-old son.

The next day, that is, Wednesday, February 25, 2015, Harris's naked body was found face down in the master bedroom by a pest exterminator who had entered to treat the apartment. He informed the property manager, who phoned the police.

The first police officer arrived at around 2:30 p.m. and secured the scene. Sabrina Holden, a member of the Crime Scene Unit, photographed and diagrammed the scene. Police discovered Harris's phone under the bed in the master bedroom, where a struggle appeared to have taken place and where Harris's body was found. Police noted that two knives were missing from the knife block in the kitchen, and they found a knife in a kitchen cabinet.

Also on that day, appellant's phone shows that he searched Google for "Woman found in Greenspoint apartment," "Woman found dead in apartment in Houston today," and "February 24th, Houston woman found dead in apt."

Officer Richard Ridel, who was then working as a homicide detective, arrived at Harris's apartment at around 3:45 that afternoon. The apartment showed no signs of forced entry, which Ridel interpreted to mean that Harris had opened her door willingly. The apartment complex had surveillance cameras covering the apartment's front door, and although Ridel arranged to meet with the property's

3

manager to recover the film, Ridel forgot to do so, and the film was overwritten after a week.

Meanwhile, on Thursday, February 26th, appellant's phone showed that he searched the internet for following:

- "Can police retrieve deleted text messages";
- "Can police pull flight manifests";
- "Can police pull travel records from airport";
- "Can police pull flight records";
- "Ebony Harris, Houston, Texas"; and
- "Woman found in Greenspoint."

Although Ridel initially assumed that Harris was murdered on February 25th——the day her body was found—his investigation shifted to focus on February 24th after he learned that this was the date Harris last used her cell phone.

Harris's mother identified appellant and five other men as people that Harris had been dating before her death. Ridel interviewed several of these men, who voluntarily gave Ridel buccal swabs of their DNA. Comparison of their DNA with DNA taken from Harris's twin embryos later revealed that Marlon Townsend,[1] not appellant, fathered the twins.

Ridel obtained historical cell-tower data from that date for the men he was investigating. He also obtained flight records and appellant's credit-card records. The credit-card records showed appellant's purchase of two pairs of gloves in Virginia, and the cell-tower data and flight records showed appellant's movements, described above. DNA analysis of some of Harris's fingernail scrapings showed DNA of unknown origin, but for one particular scraping, the likelihood that the DNA

---

[1] His name is sometimes spelled "Marlin" in the records.

present came from Harris, Harris's four-year-old son, and appellant was "90.1 quattuordecillion times more likely than that the DNA was from Harris and two unknown unrelated individuals."[2]

In a recorded phone interview with Ridel, appellant denied being in Houston at all during the week that Harris was murdered, and the calls and texts between himself and Harris before her death had been deleted from his phone. That evidence remained, however, on Harris's phone.

## B.    Conflicting Evidence of Harris's Time of Death

All of the evidence that appellant has placed at issue concerns Harris's time of death.

### 1.    Testimony of Medical Examiners

At 10:00 a.m. on Thursday, February 26, 2015, Dr. Alex John, who was at that time an assistant medical examiner with the Harris County Institute of Forensic Sciences (f/k/a the Harris County Medical Examiner's Office), performed Harris's autopsy. He found fifteen sharp force injuries, including three to the left lung, two to the right lung, and one to the heart. Dr. John also found multiple strangulation injuries, including petechiae in both eyes, two fractures of cricoid cartilage, and hemorrhages of the left thyroid gland and of the muscles on the left side of Harris's neck. In addition, there were defensive injuries to Harris's hands, as well as multiple abrasions on her head and neck.

At trial, Dr. John explained that livor mortis is skin discoloration caused by blood settling in the body. He stated that it can begin as early as two to four hours after death. Initially, applying pressure to areas of livor mortis will cause blanching

---

[2] In the United States, a quattuordecillion is $10^{45}$, that is, the number one followed by forty-five zeros.

as the pressure forces the blood back out of the area. According to Dr. John, pressure will cease to cause blanching after about twelve hours. This is called "fixed lividity." By the time of the autopsy, Harris had fixed lividity.

Dr. John was shown the investigator's report, which was not itself admitted into evidence, and he testified that, according to the report, Harris's body temperature at the scene was 64.6 degrees at 8:36 p.m., and the ambient temperature of her apartment at 10:00 p.m. was 66 degrees. He agreed that the investigator also stated in the report that the lividity of Harris's body was blanchable when examined on site on the evening of February 25, 2015. Dr. John stated that he does not use body temperature in determining the time of death because bodies are stored in coolers before an autopsy.

Dr. John did not state the time of death in his report, but he estimated that Harris had been dead for 24–48 hours at the time of the autopsy. He stated that this finding would be consistent with a time of death between 11:00 a.m. and 2:00 p.m. on February 24, 2015.

Dr. Jennifer Ross is an assistant medical examiner at the Harris County Institute of Forensic Sciences. She did not perform Harris's autopsy but had been asked to be a substitute to testify if needed. She testified that rigor mortis starts about 8–12 hours after death, lasting 8–12 hours, and that lividity is blanchable for about 12 hours, give or take a few hours.

According to Dr. Ross, body temperature decreases by 1–2 degrees per hour after death until it reaches equilibrium with its surroundings. When Harris's body temperature was taken at the scene, it had decreased by about 34 degrees. She agreed that dividing a temperature drop of 34 degrees by an average temperature drop of 1.5 degrees per hour gives a result of 22.67 hours, but she stated that this is an inexact science and could be off by four to six hours. As a second caveat, Dr. Ross pointed

6

out that the ambient temperature in the apartment was 66 degrees, and body temperature won't drop much below the ambient temperature. She stated that Harris's body temperature had reached equilibrium with the ambient temperature by the time the measurements were taken, but it could have reached that point hours earlier. According to Dr. Ross, Harris could have been killed closer to 11:30 a.m. on February 24th. Although she agreed that investigators at the scene had said that rigor mortis was present and hard to break, Dr. Ross stated that the best way to determine when someone was killed was to identify the last time they were seen alive or heard from.

### 2. Excluded Hearsay Statement of Neighbor Jeff Lewis

Harris's half-sister Alfreda Williams testified that she babysat Harris's youngest child while Harris worked at a warehouse from 2:00 p.m. to 10:00 p.m. She stated that she was babysitting the child on the evening of Monday, February 23, 2015, when Harris called or texted asking Williams to keep the child for an extra day. The next day—Tuesday, February 24th—Harris did not contact Williams or pick up the child. The child was still with Williams on Wednesday, February 25th, when Williams's father came to her home to tell her Harris was dead.

Conflicting evidence is recorded in a bill of exception, in which Officer Ridel testified that Harris's neighbor Jeff Lewis said he heard Harris at 6:00 a.m. on February 25th telling her son to get in the car. The trial court sustained the State's hearsay objection to this evidence.

### C. Conclusion of Proceedings

Appellant was indicted for capital murder for causing the death of Harris and her unborn child on or about February 24, 2015, by stabbing Harris with a knife or other sharp object or by strangling her or applying pressure to her neck with his hand

or an unknown object. The jury found him guilty and the trial court sentenced appellant to life in prison without the possibility of parole.

## II. ISSUES PRESENTED

In four issues, appellant argues that (1) by excluding evidence that a neighbor told police he heard appellant speaking to her child on the morning of February 25th, the trial court denied appellant the constitutional right to present a defense; (2) the trial court abused its discretion by overruling his objection to Harris's text message informing appellant of the pregnancy; (3) the trial court abused its discretion by admitting all of the data extracted from Harris's cell phone; and (4) the evidence is legally insufficient to support the verdict.

Because we first consider those issues that would afford an appellant the greatest relief, we begin our review with appellant's challenge to the legal sufficiency of the evidence.

## III. LEGAL SUFFICIENCY

When determining whether evidence is legally sufficient to support the verdict, we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational fact finder could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). We may not substitute our judgment for that of the fact finder by re-evaluating the weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Rather, we defer to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id*. If any rational trier of fact could have found

8

the essential elements of the crime beyond a reasonable doubt, we must affirm. *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000). "[T]he State may prove the defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence." *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009).

To prove capital murder as alleged in the indictment, the State had to prove appellant intentionally and knowingly caused Harris's death by cutting or stabbing her with a knife or other sharp object or by strangling or applying pressure to her neck with his hand or other object and that he intentionally and knowingly caused the death of one of her unborn children. *See* TEX. PENAL CODE §§ 19.03(a)(7)(A) (making it a capital offense to intentionally or knowingly murder more than one person during the same criminal transaction); 1.07(26) (defining an individual to include a living human being "at every stage of gestation from fertilization until birth"). Appellant argues that the evidence is legally insufficient because (1) "there was no evidence of foul play";[3] (2) Harris's apartment door was locked and there was no logical explanation of how Murphy could have entered and relocked the door; (3) Marlon Townsend, whom DNA evidence identified as the presumed father of Harris's twins, had no alibi; (4) the lividity and rigor of Harris's body indicated that she was murdered after Murphy left Houston; and (5) officers failed to secure surveillance footage of the apartment. We take these complaints in order.

As to appellant's first point, Dr. John testified without contradiction that Harris's cause of death was homicide by "multiple sharp force injuries and blunt neck trauma." Harris's strangulation injuries and fifteen stab wounds, some of which entered through her back, are legally sufficient evidence of "foul play."

---

[3] Black's Law Dictionary defines "foul play" as "[w]rongdoing, esp. when it involves a person's murder." *Foul play*, BLACK'S LAW DICTIONARY (11th ed. 2019).

Regarding appellant's second point—the apartment's allegedly locked door—the jury reasonably could infer, as Officer Ridel did, that the absence of evidence of forced entry indicates that Harris opened her door willingly. As for relocking Harris's apartment door after the murder, no one testified that the door was in fact locked. Kenneth Morris, the pest exterminator who discovered Harris's body, was asked at trial what he does when he approaches the front door of a unit, and he answered, "I already have the keys . . .because we get them from management." He stated, "I knock, announce myself to be pest control. I'll knock a couple of times more. And then I'll use the key if no one comes to the door to let me in." He did not state that he tries the door to see if it is unlocked before using the key. But, even if the jury were to infer that the door was locked, the jury also could infer that the door was relocked using a key, which the perpetrator could have brought with him or obtained inside the apartment.

Third, there is legally sufficient evidence that Townsend had an alibi. Ridel testified that he received a phone call from Shawna Bailey, who confirmed that Townsend was helping her move at that time. Ridel testified that he was satisfied that this confirmed Townsend's alibi.

Although appellant asserts in his fourth point that Harris was murdered after he left Houston, neither Dr. John nor Dr. Ross were able to testify to a precise time of death. The experts could do no more than identify a range of time during which Harris died, and they agreed that the condition of Harris's body was consistent with death occurring during the time that appellant was shown to be in the area of Harris's apartment.

As to appellant's fifth and final legal-insufficiency argument, Ridel's failure to obtain surveillance footage means only that there was not additional evidence identifying Harris's killer. The existing evidence, however, is more than sufficient

10

to support the jury's verdict. Evidence from Dr. John showed that Harris was pregnant with twins when she was stabbed and strangled, and that those injuries caused not only Harris's death but the death of her unborn children. Thus, more than one person was killed as part of the same criminal transaction. Appellant's DNA recovered from Harris's fingernail scrapings is evidence of appellant's guilt, as are the lies he told to investigators concerning his whereabouts during the week of the murder and his attempts to conceal incriminating evidence by deleting records of his communications with Harris from his cell phone. *See Matthews v. State*, 513 S.W.3d 45, 54 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). Finally, Ridel testified that he learned in the course of his investigation that Harris had communicated the news of her pregnancy to appellant, and jurors were shown Harris's text message to appellant. This not only gave appellant a motive to kill Harris but also provided evidence that, in murdering Harris, appellant knowingly and intentionally caused the death of the unborn children as well.

Viewing this evidence in the light most favorable to the jury's verdict, we conclude that a rational juror could have found that appellant intentionally or knowingly killed Harris and her unborn children as charged in the indictment. Thus, there is legally sufficient evidence to support his conviction. We overrule this issue.

We turn now to appellant's remaining issues, in each of which he asserts that the trial court erred in admitting or excluding evidence.

## IV. CONSTITUTIONAL COMPLAINT

Appellant's first evidentiary issue concerns a statement that Harris's neighbor Jeff Lewis allegedly made to Officer Ridel. Lewis died before trial, but on the day Harris's body was found, Lewis told Ridel that he arose at around 5:30 a.m. that day—that is, on Wednesday, February 25th—and that at around 6:00 a.m., he heard Harris tell her son to get in the car. It was for this reason that Ridel's investigation

11

initially focused on February 25th as the likely date of the murder. The trial court sustained the State's hearsay objection to this testimony.

On appeal, Appellant argues that the exclusion of this evidence deprived him of his state and federal rights to present a defense and that reversal and remand is required unless it can be determined beyond a reasonable doubt that the exclusion did not contribute to his conviction. *See Davis v. State*, 203 S.W.3d 845, 849 (Tex. Crim. App. 2006).

The exclusion of evidence could rise to the level of a constitutional violation if the exclusion (1) is dictated by a state evidentiary rule that "categorically and arbitrarily prohibits the defendant from offering otherwise relevant, reliable evidence" that is vital to the defense; or (2) is a clearly erroneous ruling excluding otherwise relevant, reliable evidence that "forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002); *Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002). Appellant does not argue that the excluded material was not hearsay or that the trial court erroneously applied the evidentiary rules regarding hearsay; rather, appellant argues that "the states have great latitude in establishing rules of evidence so long as the rule is not arbitrary or disproportionate," but "[t]he exclusion of this evidence was arbitrary and disproportionately infringed on the constitutional rights of Appellant." We accordingly understand appellant to challenge the rule against admission of hearsay unless a statute or rule provides otherwise. *See* TEX. R. EVID. 802.

This argument was not preserved for review. *See* TEX. R. APP. P. 33.1(a). A trial court "must be presented with and have the chance to rule on the specific constitutional basis for admission." *Golliday v. State*, 560 S.W.3d 664, 670 (Tex. Crim. App. 2018). The Court of Criminal Appeals has specifically stated that the

12

constitutional right to present a complete defense is subject to forfeiture for failure to preserve error. *See Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009). The challenged evidence is hearsay, and at trial appellant did not argue any grounds, constitutional or otherwise, on which it would be admissible. Appellant seems to have tried to lay a foundation to admit evidence of Lewis's statement as an excited utterance, asking Ridel if he recalled Lewis's emotional state or demeanor, and if Ridel could recall whether Lewis was upset or excited during the conversation. But, Ridel said that he did not recall, and appellant did not challenge the State's hearsay objection further.

Because appellant's constitutional complaint was not preserved in the trial court, we overrule this issue. *See Clark v. State*, 365 S.W.3d 333, 340 (Tex. Crim. App. 2012) (appellants are not permitted to "bootstrap a constitutional issue from the most innocuous trial objection").

## V. REMAINING EVIDENTIARY ISSUES

Appellant argues in his remaining issues that the trial court abused its discretion in admitting hearsay evidence obtained from Harris's cell phone. In his second issue, he argues that the trial court erred in admitting evidence of Harris's text messages of February 19, 2015, in which Harris informed appellant that she was pregnant. The exchange appears in State's Exhibit 122, which is the extraction report of data from Harris's cell phone, and in State's Exhibit 127, which is a PowerPoint summarizing some of the State's evidence. In his third issue, appellant argues that the trial court erred in admitting these two exhibits in their entirety.

We review a trial court's evidentiary rulings for abuse of discretion. *See Becerra v. State*, 685 S.W.3d 120, 145 (Tex. Crim. App. 2024). We will affirm the ruling if the evidence is admissible on any grounds. *Kipp v. State*, 876 S.W.2d 330, 337 (Tex. Crim. App. 1994).

## A.     Harris's February 19, 2015, Text Exchange with Appellant

In a discussion of Exhibits 122 and 127 outside the jury's presence, appellant first objected, "[t]his clearly falls under rank hearsay." When the trial court asked appellant to identify what specifically the appellant was referring to, appellant stated, [t]he instant chats that is [sic] purported to be between [appellant], Your Honor, and Ebony Harris." Appellant continued that, "in particular," appellant was referring "instant messaging [that] is particularly targeting proof of knowledge" that Harris was pregnant. The trial court identified a page in Exhibit 127 containing the following exchange between appellant and Harris on February 19, 2015:

Harris:      Omg I'm so scared

Appellant:  U ok

Harris:      No I'm pregnant with twins

The trial court asked appellant, "[Is] that specifically what you're objecting to?" Appellant responded, "And anything that flows thereafter related to [Harris's] condition."[4] The trial court overruled the objection on the ground that the exchange falls within the hearsay exception for evidence of a "then-existing mental, emotional, or physical condition." *See* TEX. R. EVID. 803(3).

We conclude, however, that there is more fundamental reason why the trial court did not abuse its discretion in overruling appellant's objection: Harris's statement is not hearsay. "Hearsay" is an out-of-court statement offered to prove the truth of the matter asserted in the statement. TEX. R. EVID. 801(d). This exchange was not admitted to prove that Harris was pregnant; Harris's pregnancy had already been established by Dr. John's testimony about the results of Harris's autopsy and

_____

[4] Appellant's statement that he objected on hearsay grounds to "anything that flows thereafter related to [Harris's] condition" is insufficiently specific to identify the evidence to which this refers.

14

by the testimony of Courtney Head, manager of the forensic biology and DNA section at the Houston Forensic Science Center, who analyzed the DNA from the fetal tissue.[5] Rather, the exchange was offered to prove that the communication occurred, not that the communication was true, and "[a]n extrajudicial statement or writing which is offered for the purpose of showing *what* was said rather than for the *truth* of the matter stated therein does not constitute hearsay." *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995). Appellant tacitly acknowledges this, because his only appellate argument for concluding that the trial court should not have admitted the evidence is that, without this evidence, the State would not have been able to prove an essential element of its case, namely, that appellant was aware that Harris was pregnant.

We overrule this issue.

## B.     Cell Phone Extraction and PowerPoint

Appellant objected to Exhibit 122, the cell-phone extraction report, "in its entirety" in that it was hearsay,[6] and made a running hearsay objection to Exhibit 127. In his last remaining issue, appellant argues that the trial court erred in admitting these exhibits over his objection.

On appeal, appellant first contends that the rulings were erroneous because the State did not first offer a predicate for the admission of each of Harris's text messages in the exhibits. When an exhibit contains multiple statements, only some

---

[5] Thus, even if we agreed that the texts were offered to prove the truth of the matter asserted, any error in admitting the text would be harmless because it was cumulative of other evidence admitted without objection. *See Cook v. State*, 665 S.W.3d 595, 600 (Tex. Crim. App. 2023).

[6] Appellant asserts that the extraction report "contained thousands of pages of information much of which was not relevant to the investigation," and that the trial court admitted "the entirety of the extraction" over appellant's objection. But in fact, Exhibit 122 is just nineteen pages long, and appellant did not object to its admission on relevancy grounds.

of which are inadmissible hearsay, an objecting party must identify the specific statements that are objectionable to preserve any error for appellate review. *See, e.g.*, *Whitaker v. State*, 286 S.W.3d 355, 368–69 (Tex. Crim. App. 2009) (global hearsay objection to audiotapes insufficient to preserve error as to specific statements therein); *Barnes v. State*, 876 S.W.2d 316, 329 (Tex. Crim. App. 1994) (global hearsay objection to entire pen packet insufficient to preserve error as to specific subset of documents); *Hernandez v. State*, 599 S.W.2d 614, 617 (Tex. Crim. App. 1980) (op. on reh'g) (party objecting must specifically point out the inadmissible part to preserve the alleged error). As explained above, Harris's text informing appellant of her pregnancy was not hearsay and was admissible; thus, appellant was required to identify the other statements in Exhibits 122 and 127 that he contends are inadmissible hearsay.

Other than the admissible exchange regarding Harris's pregnancy, appellant mentions four other examples, some of which are not complaints about the content of the challenged exhibits at all.

Two of appellant's examples consist of statements made by opposing counsel in closing arguments. The prosecutor stated that Harris contacted her sister to say that she, Harris, was pregnant by a Navy man and that the lack of activity on Harris's phone is proof of her time of death. But appellant did not object to these statements when they were made in closing argument, and they do not support appellant's argument that the trial court erred in overruling appellant's hearsay objections to Exhibits 122 and 127. The first of these examples is unrelated to the exhibits, neither of which contains or refers to a text from Harris to her sister (or to anyone else) attributing the pregnancy to a member of the U.S. Navy. Evidence that Harris made such statements (albeit to people other than her sister) was admitted only through testimony, to which appellant did not object. As for the second example, the absence

of activity on appellant's phone cannot be hearsay. It is not a statement; it was not made by a declarant; and it was not offered for the truth of the matter asserted, because the complete absence of activity asserts nothing at all. *See* TEX. R. EVID. 801 (defining "hearsay").

Appellant additionally notes that an investigator testified about a text from Harris to her sister, in which Harris asked her sister to babysit Harris's son overnight on Monday, February 23, 2015, and her sister agreed. The text is in the exhibits, so we construe this as a complaint about the content of the exhibits. But, assuming, without deciding, that the statement was inadmissible, any error in admitting it would be harmless, because Harris's sister testified, without objection, to the same facts. *See Cook v. State*, 665 S.W.3d 595, 600 (Tex. Crim. App. 2023). Williams related that on Monday, February 23, 2015, Harris asked Williams to babysit Harris's son for an extra day, and Williams agreed. The only difference between Williams's testimony and the text message is that Williams could not recall whether this exchange took place through a phone or by text. But, that is a distinction without a difference, for only the substance of the communication was material, regardless of the method used.

In appellant's only example drawn directly from the challenged exhibits, appellant points out that the exhibits contain a photo of an arm with an IV in it, and the photo's metadata shows that it was taken at 12:31 a.m. on February 19, 2015.[7] We need not decide whether the trial court should have excluded this evidence, because in any event, the improper admission of hearsay is non-constitutional error that is harmless unless the error affected the defendant's substantial rights. *See* TEX. R. APP. P. 44.2(b); *Garcia v. State*, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004);

---

[7] Based on the subject's complexion and a tattoo, Williams authenticated the photo as a photo of Harris's arm.

*Nino v. State*, 223 S.W.3d 749, 754 (Tex. App.—Houston [14th Dist.] 2007, no pet.). An error is harmless if we are reasonably assured that the error did not influence the verdict or had but a slight effect. *See Garcia*, 126 S.W.3d at 927; *Shaw v. State*, 329 S.W.3d 645, 653 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). Here, the photo and its metadata had only a tangential relationship to the elements of the charged offense. At best, they corroborate other evidence that Harris was seen by medical professionals on that date, which was five days before she was killed. Such evidence added little or nothing to the overwhelming proof of appellant's guilt as shown in his knowledge of Harris's pregnancy, his purchase of gloves while en route to the airport, his travel on the day of her murder, his DNA found under Harris's fingernails, his internet searches, the deletion of evidence from his phone, and his attempts to mislead investigators by denying being in Houston during the week of Harris's murder and by calling and texting Harris's phone after her death. We are confident that even if the trial court erred in admitting this evidence, it did not influence the verdict.

We overrule this issue.

### VI. CONCLUSION

We affirm the trial court's judgment.


/s/     Tracy Christopher
        Chief Justice

Panel consists of Chief Justice Christopher and Justices Zimmerer and Wilson.

Do Not Publish — TEX. R. APP. P. 47.2(b).

18